Scott Hochstetter
5419 HOLLYWOOD BLVD
STE C 137
Los Angeles, CA 90027
630-465-3557
Theloreofdoa@gmail.com
In Pro Per

**FEE PAIID**

FILED

2026 FEB 17  PM 1: 46

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY: _____ **rsm**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA WESTERN DIVISION

| | |
|---|---|
| Scott Hochstetter **PLAINTIFF** <br><br> V. <br><br> CITY OF LOS ANGELES; <br><br> LOS ANGELES POLICE DEPARTMENT; <br><br> PATRICK ALLUTTO, in his individual and official capacities as Detective; <br><br> HEATHER MATA, in her individual and official capacities as Senior Lead Officer; <br><br> RICARDO SALAZAR, in his individual and official capacities as Officer; <br><br> ROBERT RAND, in his individual and official capacities as Detective; <br><br> DOUGLASS HALL, in his individual and official capacities as Detective; <br><br> JESSE RUBALCAVA, in his individual and official capacities as Senior Lead Officer; <br><br> ERICA EMETERIO, in her individual and official capacities as Officer; <br><br> DAVID DOYLE, in his individual and official capacities as Officer; | **2:26-CV-01630-DOC-KS** <br> Case # <br> _____ <br><br> COMPLAINT FOR VIOLATIONS OF <br><br> First Amendment Retaliation (42 U.S.C. § 1983) <br><br> False Arrest and Unlawful Seizure of Person (42 U.S.C. § 1983) <br><br> Fourth Amendment Unlawful Search and Seizure of Property (42 U.S.C. § 1983) <br><br> Fourteenth Amendment — Equal Protection (Selective Enforcement)(42 U.S.C. § 1983) <br><br> Malicious Prosecution (42 U.S.C. § 1983) <br><br> Civil Rights Conspiracy (42 U.S.C. § 1983) <br><br> Municipal Liability (Monell Liability) (42 U.S.C. § 1983) |

|  | |
|---|---|
| BRIAN WHITE, in his individual and official capacities as Senior Lead Officer; | Defamation (Libel)(California Civil Code §§ 44–46) |
| JERRY TORRES, in his individual and official capacities as Detective; | Defamation (Slander)(California CivilCode §§ 44–46) |
| TIM TALMAN, in his individual and official capacities as Officer; | Fourteenth Amendment Due Process — Stigma Plus (42 U.S.C. § 1983) |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BRIAN WHITE, in his individual and official capacities as Senior Lead Officer;

JERRY TORRES, in his individual and official capacities as Detective;

TIM TALMAN, in his individual and official capacities as Officer;

RAYMOND VALOIS, in his individual and official capacities as Captain;

CRAIG HEREDIA, in his individual and official capacities as Captain;

ANNABELLE EUBANKS in her individual and official capacity as Senior Lead Officer;

SALVADOR CHAVEZ in his individual and official capacities as Officer;

CHRISTIAN MEJIA in his individual and official capacities as Sergeant;

CHRISTOPHER VELASCO in his individual and official capacities as Officer;

JAMES RICHARDSON in his individual and official capacities as a member of LAPD Clergy Council and Hollywood CPAB;

CATIE WILKES DELLIGATTI , in her individual and official capacity as Prosecutor of the Berkeley County West Virginia Prosecutors Office;

AARON NICOLARSON in his individual and official capacity as a Security Guard for Celebrity Centre International;

KARIN POUW in her individual and official capacity as Director of Public Affairs for the Church of Scientology International;

Defamation (Libel)(California Civil Code §§ 44–46)

Defamation (Slander)(California CivilCode §§ 44–46)

Fourteenth Amendment Due Process — Stigma Plus (42 U.S.C. § 1983)

(DEMAND FOR JURY TRIAL)

Church of Scientology Celebrity Centre
International

Defendants

# **COMPLAINT**

## **I. VENUE AND JURISDICTION**

1. This is a civil rights action brought pursuant to 42 U.S.C. § 1983 to redress an ongoing campaign of retaliation, intimidation, selective enforcement, unlawful seizure of property, and deprivation of constitutional rights carried out under color of state law against Scott Hochstetter ("PLAINTIFF").

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because this action presents claims arising under federal law, and pursuant to 28 U.S.C. § 1343(a)(3) and (4) because this action seeks redress for the deprivation, under color of state law, of rights secured by the Constitution and laws of the United States.

3. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, the First Amendment (including the Free Speech and Establishment Clauses), the Fourth Amendment, and the Fourteenth Amendment to the United States Constitution.

4.  This Court has authority to award declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 65.

5.  Defendants acted under color of the statutes, ordinances, regulations, customs, and usages of the State of California and the City of Los Angeles within the meaning of 42 U.S.C. § 1983. The municipal liability claims asserted herein arise pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978), based on official policies, customs.

## II. INTRODUCTION

6.  PLAINTIFF is an activist, journalist, and protester who engaged in lawful expressive activity on public sidewalks in Los Angeles, California, including public spaces outside facilities owned or affiliated with the Church of Scientology and La Poubelle Bistro and Bar.

7.  In response to PLAINTIFF's protected First Amendment activity, Defendants, acting under color of state law and in coordination with private actors affiliated with Scientology and La Poubelle Bistro and Bar, engaged in a sustained pattern of retaliatory law enforcement actions designed to silence PLAINTIFF and deter his protected speech.

8.  On February 16, 2024, PLAINTIFF was initially arrested on allegations of battery. The following day, law enforcement escalated and altered the charges to include Felony PC § 183 conspiracy and PC § 22810 illegal possession of tear gas. These

charges were subsequently rejected by the Los Angeles County District Attorney after PLAINTIFF spent 6 days in jail.

9. Despite the rejection of charges, the LAPD kept and retained PLAINTIFF's seized personal property, including two cellular telephones valued at approximately $1,400 and a computer valued at approximately $1,000. These items were not returned to PLAINTIFF.

10. PLAINTIFF is informed and believes, and based thereon alleges, that Defendants did not search these devices, despite representations in a search warrant affidavit submitted by Officer ALUOTTO that such devices would be searched for evidence of criminal conduct.

11. More than one year later, in or about March 2025, Defendants recharged PLAINTIFF with a felony violation of PC § 245, assault with a deadly weapon, arising from the same February 16, 2024 incident that had originally been classified as a misdemeanor battery and later rejected by prosecutors.

12. PLAINTIFF is currently facing felony criminal charges based on this recharacterization and escalation of previously rejected charges.

13. Two individuals present during the February 16, 2024 incident who were also arrested for PC § 183 were not prosecuted and had their charges dropped and were not recharged after they ceased protest activity.

14. PLAINTIFF is informed and believes, and based thereon alleges, that no other individuals were questioned, arrested, or prosecuted for conspiracy in connection with the February 16, 2024 incident, despite Defendants' allegation that PLAINTIFF was part of a coordinated conspiracy.

15. Defendants selectively applied and misused California criminal statutes against PLAINTIFF, while declining to enforce criminal laws against individuals who committed violent crimes against PLAINTIFF including:

    A. PC § 837 (private person arrest);

    B. PC § 302 (disturbing a religious meeting);

    C. PC § 182 (conspiracy);

    D. PC § 647(c) (obstruction of a sidewalk);

16. Defendants further characterized PLAINTIFF and other Picketers as members of an alleged organized group referred to as the "Squirrel Squad," which Defendants described as an organized hate group, despite the absence of any factual basis supporting such designation. The unique terms "Squirrel" and "Squirrel Busters" were assigned personally by L Ron Hubbard, founder of the Church of Scientiology, These terms are found in internal instruction and policy documents and are specifically used to identify individuals who practice Scientology outside of the church or anyone perceived to be antagonistic toward the organisation.

17. At no time was PLAINTIFF convicted of conspiracy, disturbing a religious meeting, or obstruction of a sidewalk, nor was PLAINTIFF subject to any civil harassment restraining order prohibiting his presence on public sidewalks.

18. At the same time, Defendants failed and refused to investigate, arrest, or prosecute numerous individuals who committed batteries, assaults, theft, and other criminal acts against PLAINTIFF, despite the existence of police reports, eyewitness testimony and available surveillance evidence.

19. PLAINTIFF was repeatedly subjected to custodial detentions, arrests, swattings, searches, and threats of incarceration, incidents in which PLAINTIFF was held at gunpoint, handcuffed, and searched without probable cause numerous times..

20. Scientology policy directives explicitly instruct members and affiliated personnel to attack and discredit perceived critics and "attackers," including directives stating: "NEVER agree to an investigation of Scientology. ONLY agree to an investigation of the attackers." (HCO Policy Letter, February 25, 1966)

21. Scientology policy further directs members to initiate campaigns to discredit perceived adversaries:

   *"If there will be a long-term threat, you are to immediately evaluate and originate a black PR campaign to destroy the person's repute and to discredit them so*

*thoroughly that they will be ostracized."* (PR Series 24, May 30, 1974)

22. PLAINTIFF alleges that the series of actions taken against him—including arrests, unlawful property seizures, deliberate criminal charge escalation, targeted swatting detentions, selective enforcement of law and coordinated communication with out-of-state prosecutors—were not isolated incidents but part of a deliberate pattern of targeted harassment undertaken in a manner consistent with Scientology's Fair Game and Dead Agenting policies and in coordination with Scientology-affiliated private actors.

23. PLAINTIFF further alleges that Scientology security personnel maintained direct communication with LAPD personnel and served as points of contact regarding PLAINTIFF and other picketers, including during swatting incidents.

24. LAPD officers and supervisors demonstrated prior knowledge of PLAINTIFF's identity, activities, and protest conduct, and coordinated law enforcement responses based on PLAINTIFF's presence and expressive activity.

25. Defendants' actions were undertaken intentionally, maliciously, and with reckless disregard for PLAINTIFF's clearly established Constitutional Rights.

26. As a direct and proximate result of Defendants' actions, PLAINTIFF suffered significant harm, including deprivation of liberty, unlawful seizure and retention of

property, emotional distress, reputational harm, economic damages, and the chilling of his First Amendment rights.

27. PLAINTIFF brings this action to vindicate his constitutional rights, obtain compensation for his injuries, and prevent further unconstitutional conduct.

## III. PARTIES

PLAINTIFF ,

28. SCOTT HOCHSTETTER, aka Defender of Ants aka DOA    (hereinafter "PLAINTIFF") is a citizen of Illinois.  PLAINTIFF was lawfully present in public forums and engaged in protected expressive activity in the State of California.

DEFENDANTS,

29. CITY OF LOS ANGELES, ("LA") a municipal entity responsible for LAPD policies, training, supervision, and discipline,

30. LOS ANGELES POLICE DEPARTMENT, ("LAPD") a department of the City of Los Angeles,

31. Patrick Aluotto, ("ALUOTTO") in his official capacity as a Detective in the LAPD Hollywood Division, and in his individual capacity;

32. Heather Mata, ("MATA") in her official capacity as a Senior Lead Officer in the LAPD, Hollywood Division, and in her individual capacity;

33. Ricardo Salazar, ("SALAZAR") in his official capacity as an officer in the LAPD Hollywood Division, and in his individual capacity;

34. Robert Rand ("RAND") in his official capacity as a Detective in the LAPD Hollywood Division, and in his individual capacity;

35. Douglass Hall ("HALL"), in his official capacity as a Detective in the LAPD Hollywood Division, and in his individual capacity;

36. Jesse Rubacalva ("RUBACALVA") in his official capacity as a Senior Lead Officer in the LAPD Hollywood Division, and in his individual capacity;

37. Erica Emeterio ("EMETERIO"), in her official capacity as an Officer in the LAPD Hollywood Division, and in her individual capacity;

38. David Doyle ("DOYLE"), in his official capacity as an Officer in the LAPD Harbor Division and in his individual capacity;

39. Brian White ("WHITE"), in his official capacity as a Senior Lead Officer in the LAPD Hollywood Division and in his individual capacity;

40. Jerry Torres ("TORRES") in his official capacity of Detective in the LAPD Central Division Major Crimes Unit and in his individual capacity;

41. Timothy Talman ("TALMAN") in his official capacity as an Officer in the LAPD Hollywood Division and in his individual capacity;

42. Raymond Valois ("VALOIS") in his official capacity as Captain of the LAPD Communications Division and in his individual capacity;

43. Craig Heredia ("HEREDIA") in his official capacity as Captain, of the LAPD Hollywood Division and in his individual capacity;

44. Annabelle Eubanks ("EUBANKS") in her official capacity as Senior Lead Officer in the LAPD Hollywood Division and in her individual capacity;

45. Salvador Chavez ("CHAVEZ") in his official capacity as an Officer in the LAPD Hollywood Division and in his individual capacity;

46. Christian Mejia ("MEJIA") in his official capacity as a Sergeant in the LAPD Hollywood Division and in his individual capacity;

47. Christopher Velasco ("VELASCO") in his official capacity as an Officer in the LAPD Hollywood Division and in his individual capacity;

48. James Richardson ("RICHARDSON") in his official capacity as an LAPD Clergy Council, and his official capacity of Hollywood CPAB Member #00898, and in his individual capacity;

49. Catie Wilkes Delligatti (CATIE) in her official capacity as Prosecutor for the Berkeley County West Virginia Prosecutors Office and in her individual capacity;

50. AARON NICOLARSON in his individual and official capacity as a Security Guard for Celebrity Centre International;

51. KARIN POUW in her individual and official capacity as Director of Public Affairs for the Church of Scientology International;

52. Church of Scientology Celebrity Centre International, a legal person

53. DOES 1-20.

## IV. FACTUAL ALLEGATIONS

54. On or about April 27, 2014 WHITE and TALMAN are pictured with US congressman Adam Schiff inside Scientology building in full LAPD uniforms to participate in the Finish the Ride fundraiser. TALMAN'S college was funded by Actress Marion Ross, a Scientologist.

55. On or about December 1, 2018 WHITE and TALMAN are pictured in full LAPD uniform in the Scientology Celebrity Center at 26th Christmas Stories Gala.

56. On or about December 2022 TALMAN and WHITE play at the Scientology Christmas Gala at Scientology Celebrity Center ("hereinafter SCC"), both in full LAPD uniforms.

57. On or about February 10, 2023 Francoise Koster, ("KOSTER") owner of La Poubelle Bistro and Bar ("BAR") sent an email to defendant MATA to set up a meeting. MATA and KOSTER meet at the Hollywood police department some time later.

58. On or about March 14, 2023 MATA invited KOSTER to the Hollywood Nightlife Community Police Advisory Board Meeting. The co-host was WHITE.

59. On or about October 21, 2023 TALMAN, EUBANKS, MATA, RICHARDSON, all attended the Faith and Blue event in Hollywood. TALMAN, MATA, and EUBANKS were all in full LAPD uniforms.

60. On or about November 15, 2023 a Los Angeles Times criminal courts reporter, James Queally, emailed senior LAPD command staff seeking comment on alleged retaliation by Scientology against prosecutors, police officers, and victims connected to the Danny Masterson prosecution as well as collusion between Scientology and Hollywood Police Department.

61. On or about December 4, 2023 a Scientology security guard filed a private person arrest ("PPA") for a California Penal Code ("PC") § 242 battery after a woman picketing Scientology accidentally brushed the security guard on the public sidewalk. EMETERIO and SALAZAR were present.

62. On or about  December 4, 2023  Scientologist Alberto Godinez smacked Scientology Picketer Willam Gude ("GUDE") phone and hand.  WHITE refused to take a report and refused to file a PPA.

63. On or about December 23, 2023 Patrick Perry's ("PERRY"), dog bites Picketer Christian Shin ("SHIN") and a bystander behind the Scientology Testing Center ("STC") in Hollywood.  Scientology security guards were present.  No arrests made.

64. On or about December 29, 2023 Scientology Jennifer Krauskopf contacted HALL for a private meeting about Scientology Picketers.

65. On or about January 2, 2024  Scientology Picketer by the name of SP Spanglish is threatened with a baton by PERRY and his aggressive dog.  An unidentified LAPD officer refused to take a report or file a PPA.  Scientology Security staff are present.

66. On or about January 5, 2024  GUDE was spit on by suspect Brian Borland in front of the STC.  Mr. Borland was arrested for a PC § 242 battery.  Mr Borland was never prosecuted for this crime.

67. On or about January 14, 2024 Scientology picketer Jasiah Adler ("ADLER"), was detained by unknown Hollywood police officers at STC for alleged possession of a gun.  This was a false call to service, also known as a swatting call.  ADLER had no weapons and was not given a Marsy's Law Pamphlet.

68. On or about January 15, 2024 SHIN was a victim of a swatting call after a false bomb threat allegedly was made at the Scientology Blue Building Campus ("BLUE") in Hollywood.  No bomb squad was deployed and the building was not evacuated.  SHIN was detained for about half an hour and was not given a Marsy's Law Pamphlet.

69. On or about January 17, 2024  ADLER was a victim of another swatting claiming he allegedly had a firearm at the STC.  He was detained, searched, cuffed and then released. He was not given a Marsy's Law Pamphlet.

70. On or about January 19, 2024 Scientology picketer Aaron Smith Levin ("ASL") was arrested a block away from the STC after PERRY strikes ASL in the head with a cane and releases his dog on him.

71. ASL was arrested for PC § 646.9 felony stalking after TALMAN stated that if ASL files a report on PERRY, he will be arrested for felony stalking. ASL filed a report, was arrested and handcuffed to the Hollywood Police department (HPD) bench for a few hours and then released with no charges.  ASL was not given a Marsy's Law Pamphlet. PERRY was not prosecuted.

72. On or about January 23, 2024 ADLER and Scientology Picketer Solomon Sassoon (SASSOON) were detained at BLUE for a swatting call for allegedly possessing a firearm.  Both were handcuffed and searched. No gun was found.

73. They remained cuffed after finding no gun on their persons until PLAINTIFF advocated for their release, questioning why they were still cuffed after finding no gun and that it was a false call to service.  Neither victim was given a Marsy's Law Pamphlet.

74. On or about February 2, 2024 Scientology Picketer Mindy Willens was the victim of a
PC § 242 battery when JoLane Rae Lentz lunged and hit Willens' phone. JoLane is
the wife of Greg Morris ("MORRIS"), the owner of the Gourmet Market next to the
BAR.

75. JoLane was not prosecuted and Willens was not given a Marsy's Law Pamphlet. The
next day Willens filed a police report at HPD and RAND refused to allow Willens to
film the interaction in the police station lobby, even though she was a victim.

76. On or about February 9, 2024  whilst on the public sidewalk, Scientology picketer
Jessica Palmadessa ("PALMADESSA") was struck in the chest by an employee of the
BAR when he reached his hand through the al fresco dining tent and committed a PC
§ 242 battery. The LAPD were called numerous times and arrived two and a half hours
later, despite the numerous 911 calls by PALMADESSA.

77. When officers arrived, DOYLE then refused to take a PPA, blaming PALMADESSA
for standing too close to the tent even though she was located on a public sidewalk.
DOYLE did not seek out video surveillance from the Bar or the SCC across the street.
PALMADESSA was not given a Marsy's Law Pamphlet.

78. On or about February 13, 2024  whilst two BAR security guards watched, a patron
from the BAR committed a PC § 242 battery by smacking at Picketer Daniel Villeda

Gonzalez, (DANNY) because he was filming on the public sidewalk. WHITE was present at this battery and did not take the suspect into custody.

79. Minutes later another BAR patron committed a PC § 242 battery by smacking the phone of a Picketer who had a Youtube channel called "Help Me Film Them." WHITE was also present for this and did not arrest the suspect. DANNY was not given a Marsy's Law pamphlet nor was the other Picketer.

80. WHITE and two BAR security officers then provided security for the BAR for about 35 minutes after not arresting either of the BAR patrons. WHITE did not obtain camera footage from across the street at SCC or surveillance cameras from the Bar or neighboring establishments to document the two attacks.

81. On or about February 14, 2024 unknown Hollywood LAPD officers provided private security and escorted KOSTER out of the BAR and stopped traffic with their vehicles to allow her to drive off.

82. KOSTER's car displayed no license plates, and the officers did not affect a citation or tow her car for illegally being on the road without license plates.

83. On or about February 14, 2024 a patron at the BAR named Daniel exited the tent in front of the BAR on the public sidewalk and instigated an argument with DANNY,

saying he could not film him. Daniel then lunged at DANNY and struck his phone and hand.

84. DANNY then discharged pepper spray in self defense and sprayed Daniel in the face. Daniel retreated into the BAR.   LAPD officers arrived and took PC § 242 battery reports for both Daniel and DANNY.  No arrests were made.

85. LAPD  officers  did  not  obtain  security  footage  from  the  BAR,  neighboring establishments or the SCC cameras across the street.  DANNY was not provided with a Marsy's Law Pamphlet.

86. On or about February 16, 2024 numerous LAPD officers, including ALUOTTO and other unidentified LAPD Does effected a felony arrest of ADLER in front of the BAR. Officers told Picketers that he was being arrested for something not involving the protests.

87. Later,  ALUOTTO  told  ADLER  that  "this  is  what  happens  when  you  protest Scientology".  The felony arrest came from PERRY who had attacked protesters on three different occasions.

88. PERRY  has  an  extensive  criminal  background  and  claimed  that  ADLER  made criminal threats in violation of PC § 422.  ADLER spent 7 days in jail, and eventually the charges were dismissed.  ADLER never made any criminal threats.

89. On or about February 16, 2024 two BAR patrons, Jane Doe 1 and Jane Doe 2, exited the tent on the public sidewalk and said "You all are fucking weirdos" and committed a PC § 242 battery by hitting DANNY's phone .

90. Jane Does 1 and 2 then attempted to flee the scene.  DANNY attempted to obtain some identifying features to positively identify them for a police report.  Jane Does 1 and 2 committed a second PC § 242 battery by hitting DANNY's phone causing it to fall to the ground and again attempted to leave the scene.

91. On the second battery, DANNY discharged pepper spray in self defense at the attackers.  Appearing intoxicated, Jane Does 1 and 2, went to their vehicle. The driver, Jane Doe 2, struck a parked vehicle as they fled the scene.

92. Jane Does 1 and 2 then drove to the HPD and filed a police report and a PPA.  Before the report was finished, MATA and RUBALCAVA were somehow made aware and they responded to the HPD to obtain the PPA's for a PC § 242 battery.

93. MATA, RUBALCAVA, ALUOTTO, DOYLE, EMETERIO, SALAZAR and other LAPD officers executed a tactical plan to effect the arrests of DANNY and Picketer Kamrin Ivone ("IVONE") on PPA's filed by the Jane Does 1 and 2 that hit DANNY and IVONE's phone.

94. At the same time in front of the BAR another patron, John Doe 1, exited and walked up to two female Picketers asking questions whilst committing PC § 242 battery, by blowing what appeared to be marijuana in front and about their faces.

95. This also violates California Health and Safety Code 11362.1 and Government Code section 7597 (1). Smoking marijuana on public sidewalks and smoking within 20ft of a public entrance.

96. IVONE stepped next to the girls and told John Doe 1 that he had already told him what the Picketers were demonstrating. John Doe 1 then stepped forward, committing a PC § 242 battery, hitting IVONE's phone, causing it to fall to the ground and break the screen, resulting in 100 dollars in damages.

97. John Doe 1 then grabbed IVONE's chest with both hands and pushed him into the side of a vehicle behind IVONE.

98. At the same time the PLAINTIFF noticed the aggressive nature of John Doe 1 blowing smoke at the two females and attacking IVONE, the PLAINTIFF then made an effort to restrain John Doe 1.

99. As PLAINTIFF attempted to restrain John Doe 1 from behind, they were both shoved by an unknown person away from IVONE into the tent in front of the BAR.

100.    PLAINTIFF tripped on the tent on the public sidewalk falling backwards with John Doe 1, with PLAINTIFF absorbing the fall. As they fell DANNY pepper sprayed John Doe 1 and PLAINTIFF in the face.

101.    John Doe 1 stood up and started verbally berating PLAINTIFF as PLAINTIFF took numerous steps back to deescalate the situation with John Doe 1 stepping forward.

102.    The BAR's security guard, Dervone Christopher ("CHRISTOPHER") grabbed John Doe 1 and attempted to calm him down.

103.    John Doe 1 then threw what appeared to be a marijuna joint in violation of PC § 242 battery at IVONE and aggressively stepped in front of and in the face of another picketer, Lara Anderson ("ANDERSON"). John Doe 1 then took his shirt off and threw it at PLAINTIFF. John Doe 1 then aggressively challenged PLAINTIFF to step around the corner to "finish this."

104.    At 22:07 according to the CAD call incident report tendered over to PLAINTIFF, a call to service came in for a PC §242 battery at the BAR and the incident recall report had special instructions from VALOIS.

105.    VALOIS, Captain of Communications for LAPD, had implemented special instructions requiring supervisors to show up or to contact RICHARDSON, Head of

Security of a private religious organization at SCC and a member of the LAPD Clergy,
when any calls to service within some predefined zone occur.

106.    The PC § 242 batteries do not occur on any particular Scientology property.
According to CAD calls in the previous three months, most of the calls to service were
from Scientology security guards.

107.    There were approximately 213 calls to service from December 2023 through to
April 2024 according to CAD call records attained through California Public Record
Requests.

108.    MATA, RUBALCAVA, ALUOTTO, DOYLE, EMETERIO, SALAZAR, and other
LAPD officers then arrived at the scene and effected the two PPA arrests on DANNY
and IVONE. Upon seeing the victims of batteries being arrested, PLAINTIFF became
afraid and decided to leave and went back to his vehicle about a block away.

109.    MATA, RUBALCAVA, ALUOTTO, DOYLE, EMETERIO, SALAZAR and other
LAPD officers refused to look at any video footage of twenty plus Picketers and
instead talked only to John Doe 1, who committed multiple batteries, and
CHRISTOPHER.

110.    No officer on scene took a report from a single picketer.  No officer on scene
obtained video footage from the BAR or neighboring businesses.  Furthermore no

officer contacted any of the Picketers or the observers afterward to take a report or to
review their video evidence of the scene.

111.    EMETERIO took a battery report for John Doe 1.   CHRISTOPHER, the security
guard for the BAR told MATA that PLAINTIFF had a weapon.  MATA then called on
the radio that the battery suspect was possibly armed.

112.    MATA told officers that they were effecting a PPA arrest on PLAINTIFF for
battery.   The PLAINTIFF had turned the corner, with no officers in sight, he went to
his vehicle.  PLAINTIFF realising his keys were locked in his vehicle decided to
return to the BAR when officers stopped and then arrested him for battery.

113.    PLAINTIFF was held at gunpoint by two officers.   One unidentified officer
pointed a hand gun and another pointed a shotgun at him to arrest him even though he
instantly complied when officers told him to stop.

114.    John Doe 1 was then transported in a LAPD vehicle to where PLAINTIFF was
located to do a field show up.  John Doe 1 then identified PLAINTIFF as the person
who allegedly battered him, directly contradicting his earlier statement when filling
out a police report with EMETERIO in which he stated that he "did not see who
grabbed him from behind."

115.    EMETERIO filled out a police report on scene and within minutes effected an arrest without verifying any information and without examining a single video to establish probable cause relying solely on John Doe 1's testimony. No PPA was filled out on scene. LAPD officers arrested PLAINTIFF on testimony of John Doe 1 only.

116.    Minutes after the positive identification ALUOTTO whilst talking with MATA said that John Doe 1 did not witness who grabbed him from behind, stating that the security guard was going to fill out a PPA. CHRISTOPHER never filled out a PPA. No officer witnessed the alleged battery.

117.    ALUOTTO did not try to rectify the fieldshow up identification. ALUOTTO claims later that he was not able to locate the security guard after the arrest, contrary to all video evidence of CHRISTOPHER being on scene and posted in front of the BAR. ALUOTTO had also spoken to CHRISTOPHER before the arrest and received his number and said he would call him later if they needed anything further.

118.    When ALUOTTO was asked if he wanted to declare the remaining people picketing at the BAR as an unlawful assembly, ALUOTTO replied 'no'.

119.    ALUOTTO can be seen on body cam footage shortly afterwards attempting to get other officers to turn off their body cams by pointing to his own camera. Another officer on the scene shook his head and refused, preventing ALUOTTO from turning off his body cam, preserving potential evidence.

120.    EMETERIO, told paramedics that showed up to treat PLAINTIFF for pepper spray on his face, that the group had been calling in false police calls. The Paramedics then wiped the PLAINTIFF's face, pushing the pepper spray into his eyes causing great pain and then left.

121.    PLAINTIFF's vehicle was then towed for fingerprints. No fingerprints were ever taken from the vehicle. The vehicle was legally parked on a public street. No other arrests for simple battery before or after this incident resulted in the towing or impounding of vehicles.

122.    PLAINTIFF's vehicle was searched the next day for weapons based on ALUOTTO's affidavit for a Search Warrant for PLAINTIFF's vehicle. ALUOTTO made numerous claims in the affidavit.

123.    In the affidavit ALUOTTO claims that the protesters (Picketers) were blocking sidewalks and harassing customers. No Picketer was ever arrested for PC § 647(C) obstruction of a sidewalk and not one Picketer was issued a permanent restraining order for civil harassment.

124.    ALUOTTO stated in an affidavit that protesters were filming people coming and going from the restaurant and stated that their goal was to shut it down. Picketers did film, exercising their First Amendment rights, filming also for safety and to capture

evidence to validate misrepresentation of their activities by the LAPD and/or patrons
of the BAR.

125.    It is both common and lawful in Hollywood, and a widely accepted practice for
paparazzi to film public figures as they enter and exit restaurants and other
establishments.  The BAR was a known hot spot for celebrities, including but not
limited to Danny Masterson, Ashton Kutcher, Mila Kunis and  Ghislane Maxwell's
Lawyer Leah Saffian.

126.    ALUOTTO's affidavit for search warrant never offered any evidence of
PLAINTIFF conspiring with others.  PLAINTIFF  never shared an email, a text
message, or a phone call with any of the others mentioned in the affidavit and had very
limited contact with them at that point.  PLAINTIFF also stated numerous times on
Live-Streams that he did not like pepper spray and has never used pepper spray in his
life.

127.    ALUTTO, without any articulable facts, claimed that both cellphones that were
confiscated from PLAINTIFF contained evidence of the conspiracy to possess tear gas
and that he would get a warrant to search them.  He did not get a warrant to search
them and two years after taking them has yet to return them or the seized computer.
PLAINTIFF filled out the proper forms for return of property that went unanswered on
three different occasions.

128.    PLAINTIFF was arrested for battery and then sometime the following morning he was rearrested for felony conspiracy and illegal use of pepper spray.  Officers claimed it was an Illegal assembly and that PLAINTIFF was a felon and not able to possess pepper spray.  PLAINTIFF never used teargas, is not a felon, and no verbal dispersal order was given.

129.    PLAINTIFF was deprived of his liberty and was in jail from February 16, 2024 to February 22, 2024.

130.    On or about February 21, 2024 Karin Pouw, Director of Public Affairs for Scientology made slanderous and defamatory statements about the picketers in a LA Times Article titled "There's a war going on: L.A. Anti-Scientology Protests bring arrests - attack allegations" stating Protesters have called in bomb and fire threats costing hundreds of thousands of dollars in taxpayer money, denying important public services for real needs in our community.

131.    On or about February 22, 2024 Natalie Shine committed a PC § 242 battery on PLAINTIFF by swinging her purse, striking him in the face when exiting the BAR.  A police report was filed incident #240222005605.    There was no arrest, no investigation, and no follow up.  Natalie Shine's husband was connected to Danny Masterson's Vineyard.

132.    On or about February 22, 2024, a drunk female Patron of the BAR, threw a cigarette at ANDERSON. LAPD officers arrested the woman. No charges were filed, no inquiry or follow up investigation was carried out.. No Marcy's Law Pamphlet was given to ANDERSON.

133.    On February 23, 2024 whilst standing in front of the BAR, PLAINTIFF had a man run from 20 feet away and snatch a brand new $1,300 cell phone from PLAINTIFF's hands and fled.

134.    PLAINTIFF gave chase and a block away, the suspect placed the phone on top of a car before fleeing several blocks, after which the suspect was arrested. PLAINTIFF filed a report,  Incident number 240606519. LAPD arrests suspect. No Marcy's pamphlet was handed out, no investigation, no prosecution, and no follow up communication.

135.    On numerous occasions and without success PLAINTIFF attempted to speak with investigators at the HPD. PLAINTIFF was informed that HALL was the assigned investigator, yet HALL refused to meet or speak to PLAINTIFF during any of his numerous visits to the HPD.

136.    On or about February 24, 2024, a patron of the BAR, Hans Uder committed a PC § 242 battery on a Scientology picketer named Sergio when exiting the tent at the BAR.

PLAINTIFF tried to obtain identifying information from Mr Uder who then
committed a PC § 242 battery and smacked the phone from PLAINTIFF's hand.

137.    Mr Uder then continued by pointing out the location of Danny Masterson's house
where one of the Jane Does alleged that she was raped after being drugged in the BAR
that he just left. No investigation was conducted, no follow up calls were made and no
arrests were carried out despite knowing the name and location of Mr. Uder. No
Marcy's Law Pamphlet was offered to PLAINTIFF.

138.    On or about March 9, 2024 a patron leaving the BAR commits a PC § 242 battery
on PLAINTIFF by pushing him into oncoming traffic. Officer Oliva takes a police
report with incident number 24052500384. No follow up investigation was
conducted, no arrest was made, and PLAINTIFF was not provided with a Marcy's
Law Pamphlet.

139.    On or about March 9, 2024 a patron exited the BAR when Scientology Picketer
Sergio was assaulted again. ALUOTTO and other officers on the scene refused to take
a police report or file a PPA. In order to file the report, ALUOTTO attempted to lure
Sergio onto private property by patting his leg as if he was coaxing a dog to come.

140.    At the same time ALUOTTO told another Picketer that they were trespassing on
the property making it clear that Sergio could be arrested for trespass if he stepped on
the property to make a police report.

141.    The suspect fled to 'Byrds', a bar and restaurant a few businesses down. The officers walked over to the location, entered the premises but did not arrest the suspect. ALUOTTO then questioned Sergio's military service. No report was taken, no follow up was conducted, no security camera footage was obtained and no Marcy's Law Pamphlet was offered.

142.    Some time later PLAINTIFF encountered MATA and MORRIS speaking at the local pizza restaurant. The owner MORRIS, whose wife had attacked Mindy Willens, was asked if PLAINTIFF had been trespassed from his property. MORRIS responded that no one had been trespassed from his property, directly contradicting prior statements by both WHITE and ALLUTO that Picketers were trespassing on the premises.

143.    On or about March 9, 2024  patrons of the BAR, Dillon Leigh and Jesse Sabol, exited the establishment and committed multiple acts of battery against GUDE. A cigarette was tossed at GUDE, constituting a violation of PC § 242 battery. GUDE was then pushed, another PC § 242 battery. Subsequently GUDE was punched in the face resulting in a broken nose and significant bodily injury constituting a violation of PC § 245 assault with a deadly weapon and/or force likely to produce great bodily injury.

144.    ALUOTTO refused to take a PPA or police report and subsequently committed a PC § 242 battery on GUDE by pushing him, claiming he was blocking the sidewalk even though the sidewalk was not blocked.

145.    The suspects fled into the BAR and concealed themselves.  The BAR has no rear exit. ALUOTTO and other officers entered the BAR and then exited claiming that the suspects had left.  A Scientology Picketer films the front door of the BAR after ALUOTTO leaves and captures the suspects leaving the bar and getting into an uber.

146.    On or about March 10, 2024 PLAINTIFF followed up at the HPD on prior battery investigations in which he was the victim. Officer Olivera informed PLAINTIFF that Rodrigez had been assigned to the case.  Despite this, no officer met  with PLAINTIFF nor did any officers contact him to provide updates or conduct follow up. As a result, PLAINTIFF received no information regarding the status of the investigations and was left without communication concerning the crimes committed against him.

147.    On or about March 14, 2024 MATA and EUBANKS took a hate crime report regarding the PLAINTIFF concerning an incident that occurred on March 8, 2024. The report was taken via an unrecorded telephone call, without body-worn camera footage and without any corresponding call to service through 911.

148.    An SCC security guard alleged that PLAINTIFF's van displayed the message 'Scientology is a Cult' characterizing the statement as hate speech and further claimed that PLAINTIFF utilized an amplified device for 10 minutes.    The security guard subsequently used large amplified speakers to play music. Based on these allegations, MATA completed and filled out a hate crime report.  PLAINTIFF was never arrested or charged under PC § 302 for disturbing a religious meeting.

149.    On or about March 14, 2024 MATA and EUBANKS took a further hate crime report regarding the PLAINTIFF concerning an incident that occurred on March 9, 2024. This report was taken through private communications that were not recorded.

150.    The SCC Security guard alleged that PLAINTIFF used an amplified device for approximately 10 minutes stating that 'Scientology supports Human trafficking and rape' and that the message displayed on his van 'Scientology is a cult' constituted hate speech.    The security guard further claimed that he was engaged in worship during those 10 minutes and that the PLAINTIFF's statements disturbed him.  PLAINTIFF was never arrested or charged under PC § 302 for disturbing a religious meeting.

151.    On or about March 14, 2024 a further report was filed for an alleged violation of PC § 302 on March 12, 2024 by MATA and EUBANK, after receiving private communications from an unknown member of the SCC. This was not done through the normal avenues for reporting a crime and no call to service was made via 911.

152. MATA and EUBANK claimed in all three police reports that the 'Squirrel Squad' had made numerous false reports of emergencies, violent crimes and property crimes. However, no picketer had been arrested for any property crime or charged with making false reports. MATA further alleged that PLAINTIFF was using an amplified device, while noting that SCC security members subsequently used amplified devices to play music.

153. MATA and EUBANK treated this complaint as a hate crime and completed the necessary paperwork. PLAINTIFF was never charged with a violation of PC § 302. MATA asserted that PLAINTIFF's statement 'Scientology is a cult' constituted a hate crime despite being protected expression under the First Amendment.

154. On March 20, 2024 three LAPD officers; LAPD Doe 1, who was on scene for the aforementioned arrest of Aaron Smith Levin, LAPD Doe 2 and LAPD Doe 3 responded to La Poubelle Bistro & Bar following an unknown call to service. The officers told ADLER that he was not permitted to be at that location across the street from the SCC. ADLER had no stay away order from SCC. The three officers then forced ADLER to cease picketing and threatened him with arrest if he did not leave. No records exist of a call to service corresponding to this incident. ADLER left.

155. On or about April 2, 2024 Captain HEREDIA conspired with private actors by sending an email to (Franciose) KOSTER and MORRIS as well as HALL (the primary

investigator for the February 16, 2024 PC § 242 battery), RUBALCAVA, and two
unidentified individuals, stating the following:

> " *Francoise, Good evening. We will have officers in the area conducting*
> *directed patrol. They will be in the area and available to respond to calls for*
> *service, as appropriate.    The information regarding Scott Hochstetter*
> *(PLAINTIFF) planning to be at/near your restaurant tonight has been shared*
> *with the supervisor and officers"*

156.   On or about April 4, 2024, HALL conducted a follow up investigation into
PLAINTIFF for three alleged violations of PC § 302 (disturbing a religious meeting)
occurring on March 8, March 9, and March 12 at the SCC.  He did not conduct a
follow up investigation for any of the previously mentioned PC § 242 batteries and PC
§ 245 assaults with deadly weapons committed against Picketers.  In this follow up
report HALL characterized the PLAINTIFF as engaging in an aggressive form of civil
harassment, despite the fact that PLAINTIFF had no permanent restraining orders for
civil harassment in 2024, 2025 or 2026.

157.   On or about April 17, 2024, BAR patron Cage Crismond attacked PLAINTIFF
while he was seated outside the BAR.  Crismond flipped over PLAINTIFF's table,
scattering  flyers and when PLAINTIFF stood Crismond punched him in the face,
constituting a violation of  PC § 245 (assault with a deadly weapon or force likely to
produce great bodily injury).

158.    The impact caused PLAINTIFF to fly back into his table, breaking it and resulting in a black eye for PLAINTIFF.  LAPD officers Borjas and Olive filed a police report with incident number 24041700005242.  No investigation was conducted, no follow up occurred and PLAINTIFF was not provided with a Marcy's Law Pamphlet.

159.    On or about May 25, 2024, PLAINTIFF was arrested on a PPA for an alleged violation of PC § 302 (disturbing a religious meeting)  by SCC security guard Aaron Nicolarson and taken into custody by VELASCO. On that date, two calls for service were made for the BAR at 5907 Franklin Ave, the first at 18:44 hours for a PC § 415 disturbance, to which unit 6FB34 was dispatched and the second at 23:01 hours for a PC § 245 assault, to which unit 6A15 was dispatched..

160.    PLAINTIFF was in his parked vehicle in front of the BAR when both the BAR and SCC were playing loud amplified music outside their establishments.  To be heard over the music PLAINTIFF used a bullhorn to make statements explaining the reasons for his picketing of the BAR.  The statements contained no obscenities and were directed at KOSTER and the BAR. This activity lasted for approximately 5 to 10 minutes.  During this time KOSTER was in her car without license plates in violation of California Vehicle Code § 5200.

161.    According to the police report filed by VELASCO and officer Rizea, unit 6FB34 received a call for service at 10:10 hours for a reported PC § 245 (assault with a deadly weapon) at 5907 Franklin Ave.  However, according to CAD records Unit

6FB34 was dispatched at 18:44 hours for a PC § 415 disturbance. Additionally, Unit 6A15 was dispatched at 23:01 hours for a separate PC § 245 (assault with a deadly weapon).

162.   Instead of responding directly to the location listed in the call for service at 5907 Franklin, officers made their way to SCC. Within ten minutes of the call for service being made, the officers arrived at a location not specified in the call, where they found a Scientology security guard. The officers took a police report, had NICOLARSON complete a PPA and then interviewed two additional witnesses, taking their statements.

163.   The officers effectuated an arrest at 20:20 hours, just ten minutes after the call for service was made. However, according to the police report, NICOLARSON alleged that at 18:40 hours PLAINTIFF used a megaphone to make obscenities and multiple chants directed towards Scientology members. In contrast, two witnesses said they could not hear what PLAINTIFF was saying but felt disturbed by the activity.

164.   According to the police report, OFFICERS arrived with three units to extract PLAINTIFF from his vehicle at 10:10 hrs. Officers RAND and MEJIA were on the scene. After   PLAINTIFF was arrested, CHAVEZ assaulted DANNY and ANDERSON by hitting them in the chest. DANNY required medical attention and experienced shortness of breath. One of the officers intervened to restrain CHAVEZ from assaulting any more Picketers. HALL was the investigator assigned to the case.

PLAINTIFF was jailed for a few hours.  When PLAINTIFF attended court, he was not listed on the docket.

165.    On or about June 4, 2024 TORRES emailed Garrett Robertson at the West Virginia Prosecutors office at 12:07 PM notifying him of three police reports that were taken against PLAINTIFF for the Church of Scientology.   In the email TORRES stated he was seeking a PC § 302 filing for the disruption of religious services.

166.    The information about PLAINTIFF's probation conditions from protesting in West Virginia was obtained through the search of his vehicle on February 16, 2024. ALUOTTO did not specify in his affidavit that he was attempting to find papers. Although the affidavit for the warrant by ALUOTTO did not mention any specific papers sought, the PLAINTIFF'S probation papers were seized during the search which led officers to become aware of his probation conditions in West Virginia. Despite hundreds of papers that were under PLAINTIFF'S bed, only probation papers were seized.  These probation papers explicitly stated that the PLAINTIFF could not be arrested.

167.    On June 4, 2024, at 12:52 PM, Garrett Robertson forwarded the email to Dominic Orsini, a legal assistant at the West Virginia Prosecutor's Office, with a comment stating,  "*check it out, fairly amusing*."

168. At 1:22 PM on June 4, 2024, Dominic Orsini forwarded the email to Defendant CATIE, with the subject line: "*FW: Scott Hochstetter LAPD Reports.*"

169. At 1:30 PM Defendant CATIE then sends an email to Anthony with an attachment: "*image001.png and Church of Scientology Reports.pdf*" stating that "*The Scientologists called and offered to pay our cost of extradition if we revoke his probation.*"

170. The specific DA rejection pursuant to PC § 849.5 states that in any case in which a person is arrested and subsequently released, and no accusatory pleading is filed charging the individual with an offense, the record of the person's arrest shall include a record of release. As a result the arrest shall not be considered an arrest, but rather a detention.

171. Officers, including RAND and TORRES, repeatedly referred to PLAINTIFF's detention as an arrest. Subsequently PLAINTIFF was then subjected to a bail revocation hearing. PLAINTIFF's lawyer argued that the incident was a detention, not an arrest, and as a result PLAINTIFF's probation was not revoked.

172. The West Virginia Prosecutors office subsequently revoked PLAINTIFF's probation. PLAINTIFF attended a revocation hearing with his lawyer who argued that PLAINTIFF was not arrested on February 16, 2024 but was instead detained, in accordance with the specific provisions outlined in the DA rejection under PC § 849.5.

173.    On June 21, 2024, PLAINTIFF attended court for the PPA arrest on May 25, 2024. However, PLAINTIFF was not listed on the docket.  PLAINTIFF received a Proof of Appearance from the clerk at the clerk's office.

174.    On or about  July 6, 2024 Unidentified LAPD officers from Hollywood division held PLAINTIFF at gunpoint for a swatting call on Hollywood Blvd after he left SCC. PLAINTIFF was handcuffed and the unknown LAPD officers stated that if PLAINTIFF did not provide his name he would be going to jail.

175.    An unidentified supervisor appeared at the scene and identified PLAINTIFF as the 'Defender of Ants'.  PLAINTIFF's  vehicle was searched and he remained handcuffed for another ten minutes before being released without charges.  No Marcy's Law Pamphlet was provided to PLAINTIFF.

176.    On or about November 21, 2024  PLAINTIFF was a victim of another swatting call during which he was handcuffed for approximately forty-five minutes after being falsely accused of carrying a gun in front of the San Francisco Scientology building. A caller instructed San Francisco officers to contact the LAPD Hollywood Division, in relation to the incident.

177.    According to the Event History Detail tendered over in a Public records request, RAND received the call and made the following defamatory and slanderous remarks;

173.    On June 21, 2024, PLAINTIFF attended court for the PPA arrest on May 25, 2024. However, PLAINTIFF was not listed on the docket.  PLAINTIFF received a Proof of Appearance from the clerk at the clerk's office.

174.    On or about  July 6, 2024 Unidentified LAPD officers from Hollywood division held PLAINTIFF at gunpoint for a swatting call on Hollywood Blvd after he left SCC. PLAINTIFF was handcuffed and the unknown LAPD officers stated that if PLAINTIFF did not provide his name he would be going to jail.

175.    An unidentified supervisor appeared at the scene and identified PLAINTIFF as the 'Defender of Ants'.  PLAINTIFF's  vehicle was searched and he remained handcuffed for another ten minutes before being released without charges.  No Marcy's Law Pamphlet was provided to PLAINTIFF.

176.    On or about November 21, 2024  PLAINTIFF was a victim of another swatting call during which he was handcuffed for approximately forty-five minutes after being falsely accused of carrying a gun in front of the San Francisco Scientology building. A caller instructed San Francisco officers to contact the LAPD Hollywood Division, in relation to the incident.

177.    According to the Event History Detail tendered over in a Public records request, RAND received the call and made the following defamatory and slanderous remarks;

*"Be advised that subject has a lot of run-ins with LAPD, Exposing deadly weapons, battery, felony vandalism, false police reports, gun charges, possession of narcotics, Church of Scientology Director has more at this Organization ____  ____ ( Redacted ) provide cell phone number but request it not be put on cad."*

178.    On or about December 31, 2024  in Case No. 24STRO01357  The Honorable Richard Bloom issued a proposed judgement awarding PLAINTIFF's lawyers $120,487.94 in fees for a successful anti-slapp motion in the LA County Court. This ruling followed a restraining order that was issued by KOSTER, the owner of the BAR.  PLAINTIFF was engaged in constitutionally protected speech on the public sidewalk in front of the BAR, despite KOSTER's claims that the PLAINTIFF was stalking him.

179.    On or about the year 2024, while PLAINTIFF and SASSOON were picketing in front of BAR , two masked individuals exited the al fresco tent at the front and displayed signs with explicit images (erect penises). They approached the picketers and placed the signs in front of the cameras and in front of a minor's face.

180.    PLAINTIFF recognized one of the masked persons to be the short male bartender who worked at the BAR.  PLAINTIFF and SASSOON went to HPD and attempted to file a report.  RAND refused to take a report without SASSOON's parent present and declined to take a report from PLAINTIFF.

181.    On or about the year 2024, Picketers attended a liquor license hearing for the BAR.  WHITE a Senior Lead Officer for the Hollywood division appeared at the meeting in Downtown LA Central Division while in full LAPD uniform.

182.    Picketers went to the liquor license hearing to raise concerns about several issues, including smoking within 15 feet of the entrance, open cocaine use in the restaurant, highly intoxicated patrons, drinking on the public sidewalk, and even an incident where a man who passed out inside the tent of the BAR, only to be moved outside and left unresponsive.

183.    The hearing for the BAR (La Poubelle) was continued and Picketers were not allowed to provide comments.  When Picketers attempted to raise concerns after the continuance, WHITE quickly demanded that they leave the premises.

184.    The State Department of Alcoholic Beverage Control (ABC) and the Los Angeles Police Department (LAPD) are supposed to collaborate in monitoring ABC licensed establishments within the City, educating licensees and their employees about the responsible distribution of alcohol, and enforcing all applicable laws.

185.    However, no reports from LAPD were made to the ABC about the crimes occurring around the BAR.

186.    Church of Scientology Celebrity Centre International ("SCC") coordinated with security personnel and law enforcement to employ policies such as Fair Game and Dead Agenting to silence its critics. Numerous pastors, ministers, and agents of the SCC actively worked to fabricate false police reports, attributing these reports to the Picketers in an effort to discredit them.

187.    SCC's policies encouraged its agents to target and attack anyone who is against the SCC and to conspire with LAPD and LA through a variety of means, including private meetings, private phone calls, volunteer events, community clean ups, and a range of other gatherings.    Officers attended multiple events organized by SCC, such as Christmas galas and other functions, to further their coordinated efforts.

188.    SCC provided large 10,000 dollar donations to the HPD for numerous years.

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

189.    First Amendment Retaliation  (42 U.S.C. § 1983)

Against Defendants: CITY OF LOS ANGELES; MATA; HALL; RAND; ALUOTTO; VELASCO; TORRES; HEREDIA; WHITE; TALMAN; SCC; and DOES 1–50

190.    PLAINTIFF realleges and incorporates all preceding paragraphs.

191.   PLAINTIFF engaged in protected First Amendment activity, including peaceful protest, filming, journalism, and expressive speech on public sidewalks.

192.   Defendants were aware of PLAINTIFF's protected activity.

193.   In retaliation, Defendants engaged in adverse actions, including:

    a.   Arresting PLAINTIFF on February 16, 2024;

    b.   Escalating charges from battery to felony conspiracy and illegal possession of tear gas;

    c.   Referring PLAINTIFF to West Virginia prosecutors;

    d.   Filing retaliatory reports under Penal Code § 302;

    e.   Participating in swatting-related detentions;

    f.   Seizing PLAINTIFF's property;

    g.   Communicating defamatory and prejudicial information about PLAINTIFF to other law enforcement agencies.

194.   These actions were motivated by PLAINTIFF's protected speech.

195.   These actions would chill a person of ordinary firmness from continuing to engage in protected speech.

196.   PLAINTIFF  suffered damages, loss of income, emotional distress, shame

**SECOND CAUSE OF ACTION**

197.   Fourth Amendment — False Arrest and Unlawful Seizure of Person (42 U.S.C. § 1983) Against Defendants: MATA; ALUOTTO; RUBALCAVA; EMETERIO; SALAZAR; RAND; VELASCO; and DOES 1–50

198.   PLAINTIFF realleges all preceding paragraphs.

199.  Defendants arrested PLAINTIFF without probable cause.

200.  The arrest was based on unreliable statements, failure to review video evidence, and fabricated or unsupported allegations.

201.  Charges were later rejected pursuant to Penal Code § 849.5.

202.  PLAINTIFF  was deprived of liberty from February 16–22, 2024.

203.  PLAINTIFF suffered damages, shame, emotional distress

204.  PLAINTIFF suffered from Panic Attacks after this event


**THIRD CAUSE OF ACTION**

205.  Fourth Amendment — Unlawful Search and Seizure of Property (42 U.S.C. § 1983)

      Against Defendants ALUOTTO; HALL; and DOES 1–50

206.  PLAINTIFF  realleges all preceding paragraphs.

207.  Defendants seized PLAINTIFF's:

      a.  Two cell phones valued at approximately $1,400;

      b.  Computer valued at approximately $1,000;

      c.  Vehicle.

      d.  Fur Coat

      e.  Black socks

208.  Defendants did not obtain or execute a valid warrant to search the phones.

209.  Defendants retained PLAINTIFF's property without justification and refused to return  it once the DA rejected the charges.

210.    PLAINTIFF suffered damages.


**FOURTH CAUSE OF ACTION**


211.    Fourteenth Amendment — Equal Protection (Selective Enforcement)(42 U.S.C. § 1983) Against Defendants CITY OF LOS ANGELES; LAPD; MATA; HALL; RAND; ALUOTTO; WHITE; TALMAN; and DOES 1–50

212.    PLAINTIFF realleges all preceding paragraphs.

213.    Defendants selectively enforced laws against PLAINTIFF.

214.    Defendants used Penal Code §§ 837, 302, 182, and 647(c) against PLAINTIFF.

215.    Defendants refused to arrest or investigate individuals who committed batteries and assaults against PLAINTIFF.

216.    This selective enforcement was motivated by PLAINTIFF's protected speech.

217.    PLAINTIFF suffered damages.


**FIFTH CAUSE OF ACTION**


218.    Malicious Prosecution (42 U.S.C. § 1983)

    Against Defendants MATA;    ALUOTTO;    HALL;    TORRES;    CATIE; NICOLARSON; SCC  and DOES 1–50

219.    PLAINTIFF realleges all preceding paragraphs.

220.    Defendants caused criminal charges to be filed without probable cause.

221.    Charges were rejected.

222. Defendants later recharged PLAINTIFF with felony charges based on the same incident.

223. Defendants acted with malice and retaliatory motive.

224. PLAINTIFF suffered damages.

**SIXTH CAUSE OF ACTION**

225. Civil Rights Conspiracy  (42 U.S.C. § 1983)

Against Defendants CITY OF LOS ANGELES; MATA; HALL; RAND; ALUOTTO; TORRES; HEREDIA; WHITE; TALMAN; and DOES 1–50

226. PLAINTIFF realleges all preceding paragraphs.

227. Defendants agreed to deprive PLAINTIFF of constitutional rights.

228. Defendants coordinated arrests, reports, and law enforcement actions.

229. Defendants communicated with Scientology security and West Virginia prosecutors.

230. PLAINTIFF suffered damages.

**SEVENTH CAUSE OF ACTION**

231. Municipal Liability (Monell Liability) (42 U.S.C. § 1983) Against Defendant CITY OF LOS ANGELES

232. PLAINTIFF realleges all preceding paragraphs.

233. The City maintained policies, customs, and practices including:

a.   Retaliatory enforcement against protesters;

b.   Coordination with Scientology security;

c.   Failure to investigate crimes against PLAINTIFF;

d.   Improper seizures and arrests.

234.   These policies caused constitutional violations.

235.   PLAINTIFF suffered damages.


## EIGHTH CAUSE OF ACTION


236.   Defamation (Libel)(California Civil Code §§ 44–46)

Against Defendant KARIN POUW and DOE SCIENTOLOGY DEFENDANTS

237.   PLAINTIFF realleges all preceding paragraphs.

238.   On February 21, 2024, Karin Pouw published false statements in the Los Angeles Times accusing protesters of making bomb threats.

239.   These statements were false.

240.   The statements harmed PLAINTIFF's reputation.

241.   PLAINTIFF suffered damages. Ridicule, shame, and emotional distress


## NINTH CAUSE OF ACTION


242.   Defamation (Slander)(California Civil Code §§ 44–46) Against Defendant RAND and DOES 1–20

243.   PLAINTIFF realleges all preceding paragraphs.

244. On November 21, 2024, RAND communicated false statements to San Francisco officers alleging criminal conduct by PLAINTIFF.

245. These statements were false.

246. The PLAINTIFF was detained and suffered reputational harm.

247. PLAINTIFF suffered damages.

## TENTH CAUSE OF ACTION

248. Fourteenth Amendment Due Process — Stigma Plus (42 U.S.C. § 1983)

    Against Defendants RAND; KARIN POUW and CITY OF LOS ANGELES.

249. PLAINTIFF realleges all preceding paragraphs.

250. Defendants made stigmatizing false statements.

251. These statements were combined with detention and seizure.

252. PLAINTIFF suffered damages.

## VI. PRAYER FOR RELIEF

253. WHEREFORE, PLAINTIFF SCOTT HOCHSTETTER respectfully requests that this Court enter judgment in his favor and against Defendants, and grant the following relief:

254. Declaratory Relief

    a. A declaration that Defendants' actions, policies, customs, and practices described herein violated PLAINTIFF's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution;

b. A declaration that Defendants' actions constituted unlawful retaliation against PLAINTIFF for engaging in protected First Amendment activity;

255. Compensatory Damages

   i. Compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial, including but not limited to damages for:

      1. Loss of liberty;

      2. Emotional distress;

      3. Mental anguish;

      4. Reputational harm;

      5. Loss of property;

      6. Loss of use of property;

      7. Economic losses;

      8. Legal expenses incurred defending against malicious and retaliatory criminal proceedings;

256. Special and Economic Damages

   a. The full replacement value of PLAINTIFF's seized and retained property, including but not limited to:

      i. Two cellular phones valued at approximately $1,400;

      ii. One computer valued at approximately $1,000;

      iii. Any additional personal property seized and not returned;

b. Damages related to lost income, lost opportunities, and financial harm
resulting from Defendants' unlawful conduct;

257. Punitive Damages

a. Punitive and exemplary damages against the individual Defendants in their
individual capacities, in an amount sufficient to punish and deter them and
others from engaging in similar misconduct, as permitted by law;

258. Injunctive Relief

a. Preliminary and permanent injunctive relief prohibiting Defendants from:

   i. Retaliating against PLAINTIFF for engaging in protected First
   Amendment activity;

   ii. Subjecting PLAINTIFF to unlawful detention, arrest, or investigation
   without probable cause;

   iii. Retaining PLAINTIFF's property without lawful justification;

259. An order requiring Defendants to return all seized property belonging to
PLAINTIFF;

260. Costs and Fees

a. Reasonable attorney's fees and litigation costs pursuant to 42 U.S.C. § 1988
and other applicable law;

b.  Costs of suit incurred herein;

261.    Further Relief

a.  Such other and further relief as the Court deems just and proper.

## VII. JURY DEMAND

262.    PLAINTIFF hereby demands a trial by jury on all issues so triable.

I declare under penalty of perjury that the foregoing is true and correct.

DATE    2.17.26                              SCOTT HOCHSTETTER

                                             PLAINTIFF, Pro Se