Scott Hochstetter
5419 HOLLYWOOD BLVD
STE C 137
Los Angeles, CA 90027
630-465-3557
Theloreofdoa@gmail.com
In Pro Per

FILED

2026 APR -9  PM 12: 15

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA WESTERN DIVISION

Scott Hochstetter

PLAINTIFF

V.

CITY OF LOS ANGELES;

PATRICK ALUOTTO, in his individual and official capacities as Detective;

HEATHER MATA, in her individual and official capacities as Senior Lead Officer;

RICARDO SALAZAR, in his individual and official capacities as Officer;

DOUGLASS HALL, in his individual and official capacities as Detective;

JESSE RUBALCAVA, in his individual and official capacities as Senior Lead Officer;

ERICA EMETERIO, in her individual and official capacities as Officer;

DAVID DOYLE, in his individual and official capacities as Officer;

JERRY TORRES, in his individual and official capacities as Detective;

TIMOTHY TALMAN, in his individual and official capacities as Officer;

Case #2:26-cv-01630

1ST AMENDEND COMPLAINT FOR VIOLATIONS OF

First Amendment Retaliation (42 U.S.C. § 1983)

False Arrest and Unlawful Seizure of Person (42 U.S.C. § 1983)

Fourth Amendment Unlawful Search and Seizure of Property (42 U.S.C. § 1983)

Fourteenth Amendment — Equal Protection (Selective Enforcement)(42 U.S.C. § 1983)

Malicious Prosecution (42 U.S.C. § 1983)

Civil Rights Conspiracy (42 U.S.C. § 1983)

Municipal Liability (Monell Liability) (42 U.S.C. § 1983)

AMENDENDED COMPLAINT ORIGINAL 1

RAYMOND VALOIS, in his individual and official capacities as Captain;

CRAIG HEREDIA, in his individual and official capacities as Captain;

ANNABELLE EUBANK in her individual and official capacity as Senior Lead Officer;

CHRISTOPHER VELASCO in his individual and official capacities as Officer;

JAMES RICHARDSON in his individual and official capacities as a member of LAPD Clergy Council and Hollywood CPAB;

AARON NICOLARSON in his individual and official capacity as a Security Guard for Celebrity Centre International;

Church of Scientology Celebrity Centre International

Does 1-40

Defendants

Fourteenth Amendment Due Process — Stigma Plus (42 U.S.C. § 1983)

DEMAND FOR JURY TRIAL

## 1ST AMENDED COMPLAINT

## I. VENUE AND JURISDICTION

1.     This civil rights action brought pursuant to 42 U.S.C. § 1983 seeks to redress an ongoing campaign of retaliation, intimidation, selective enforcement, unlawful seizure of property, and deprivation of constitutional rights carried out under color of state law against Scott Hochstetter ("PLAINTIFF").

AMENDENDED COMPLAINT ORIGINAL 2

2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because this action presents claims arising under federal law, and pursuant to 28 U.S.C. § 1343(a)(3) and (4) because this action seeks redress for the deprivation, under color of state law, of rights secured by the Constitution and laws of the United States.

3.    This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, the First Amendment (including the Free Speech and Establishment Clauses), the Fourth Amendment, and the Fourteenth Amendment to the United States Constitution.

4.    This Court has authority to award declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 65.

5.    Defendants acted under color of the statutes, ordinances, regulations, customs, and usages of the State of California and the City of Los Angeles within the meaning of 42 U.S.C. § 1983. The municipal liability claims asserted herein arise pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978), based on official policies, customs.

**II.  INTRODUCTION**

AMENDENDED COMPLAINT ORIGINAL 3

6. PLAINTIFF alleges that his arrest on February 16, 2024 compelled him to seek relief for two unlawful arrests within the applicable statute of limitations, while he simultaneously faces charges in the Los Angeles court system. PLAINTIFF further alleges that the February 16, 2024 incident was not isolated but part of a broader pattern of conduct evidencing coordination between Scientology and LAPD officers to target individuals protesting Scientology, while declining to arrest individuals aligned with, or supportive of Scientology engaging in similar conduct.

7. The statute of limitations for PLAINTIFF's § 1983 claim arising from the February 16, 2024 arrest expired on February 16, 2026; however, because that date fell on a court holiday, the deadline extended to February 17, 2026..

8. PLAINTIFF does not allege here nor does he request the honorable Court to consider the constitutionality of his arrest in March of 2025 for the felony charges he is currently facing in Los Angeles but seeks relief for the arrest on February 16 , 2024 and February 17, 2024.

9. PLAINTIFF is currently facing additional charges, including five matters related to Scientology which are not alleged in this complaint and are separate from the claims raised herein .

10. PLAINTIFF is aware that certain items remain in custody including his fur coat, cell phones and computer relating to current charges, while other items,

specifically his black socks, court papers that were seized, his van and his computer bag were returned to him following his release from custody after the arrest in February 16th and 17th of 2024.

11. PLAINTIFF alleges that the unlawful search and seizure at issue centered on his van and the seizure of the court papers that were later used against him, as well as personal property, including PLAINTIFF's famous black socks.

12. PLAINTIFF seeks relief for the PPA arrest on February 16, 2024 which involved allegations of battery, as well as for the arrest on February 17, 2024 alleging felony conspiracy and unlawful use of tear gas.

13. PLAINTIFF alleges that, while some facts are similar, not all facts are the same, and the matters at issue are separate and distinct.

14. PLAINTIFF alleges that the current charges pending in court do not include any allegations of conspiracy, and no other person is charged with conspiring with PLAINTIFF. The two other individuals arrested on February 16, 2024 in connection with the alleged conspiracy were not charged and are not facing any criminal proceedings.

15. The original arrest was a Private Persons Arrest, but no PPA was filed or effectuated. No Defendants witnessed the alleged misdemeanor battery, no investigation was conducted nor witnesses interviewed before, during or after

arrest and no video footage of the incident was reviewed. Moreover, no arrests were made in connection with the numerous alleged batteries against other picketers on February 16, 2024.

16. PLAINTIFF further alleges that he was arrested pursuant to a Private Person's Arrest (PPA), by a security guard for Scientology on May 25, 2024 for an alleged violation of PC 302, disturbing a religious meeting. PLAINTIFF attended court and was not listed on the docket.

17. Approximately eight months later, the Los Angeles City Attorney charged PLAINTIFF with disturbing the peace and loud and raucous noise; that case remains pending. PLAINTIFF contends that these incidents are separate events carried out by different actors. Both Private Person's Arrests were initiated by private actors directing the Los Angeles Police Department to effectuate the arrests.

18. PLAINTIFF is not alleging in this Complaint that the loud and raucous noise charges are unconstitutional. PLAINTIFF does allege, however, that the Private Person's Arrest for a Penal Code § 302 violation was unlawful, and that Defendants did not interview any witnesses who were not Scientologists, did not look at any videos other then those provided by Scientologists and that it was a coordinated attempt to stop Plaintiff to stop protesting.

19. PLAINTIFF is an activist, journalist, and protester who engaged in lawful expressive activity on public sidewalks in Los Angeles, California, including public spaces outside facilities owned or affiliated with the Church of Scientology and La Poubelle Bistro and Bar.

20. In response to PLAINTIFF's protected First Amendment activity, Defendants, acting under color of state law and in coordination with private actors affiliated with Scientology and La Poubelle Bistro and Bar, engaged in a sustained pattern of retaliatory law enforcement actions designed to silence PLAINTIFF and deter his protected speech. PLAINTIFF won an anti Slapp lawsuit in front of the sidewalk and the court ruled that PLAINTIFF was involved in protected first amendment activity.

21. On February 16, 2024, PLAINTIFF was initially arrested on allegations of battery pursuant to a Private Person's Arrest ("PPA"). The following day, law enforcement escalated the matter, altering the charges to include Felony PC § 183 conspiracy and PC § 22810 illegal possession of tear gas. These charges were later rejected by the Los Angeles County District Attorney after PLAINTIFF spent six days in custody.

22. PLAINTIFF is informed and believes, and on that basis alleges, that Defendants did not search any of the cellphones seized in connection with the conspiracy charges, despite representations in a search warrant affidavit submitted by Officer ALUOTTO that the devices would be examined for evidence of criminal conduct

AMENDENDED COMPLAINT ORIGINAL 7

and conspiracy.  ALUOTTO also did not seize phones from the other two picketers who were arrested.

23. More than one year later, in or about March 2025, Defendants recharged PLAINTIFF with a felony violation of PC § 245, assault with a deadly weapon, arising from the same February 16, 2024 incident.  PLAINTIFF does not challenge the constitutionality of the PC § 245 arrest in this Complaint but instead focuses on the conspiracy arrest and the two Private Person's Arrests.

24. Two individuals present during the February 16, 2024 incident, who were also arrested for PC § 183, were not prosecuted, had their charges dismissed, and were not recharged after they ceased protest activity.

25. PLAINTIFF is informed and believes, and on that basis  alleges, that no other individuals were questioned, arrested, or prosecuted for conspiracy in connection with the February 16, 2024 incident, despite Defendants' assertion  that PLAINTIFF was part of a coordinated conspiracy.

26. Defendants alleged that Willam Gude ("GUDE") and Jessica Palamadessa ("PALAMADESSA") were members of the alleged conspiracy and that PALAMADESSA provided tear gas to other protesters; however, neither individual was ever questioned or arrested.

AMENDENDED COMPLAINT ORIGINAL 8

27. Defendants selectively applied and misused California criminal statutes against PLAINTIFF and other anti Scientology protesters, while declining to enforce criminal laws against individuals and Scientologists who committed violent acts against PLAINTIFF including:

    A. PC § 837 (private person arrest);

    B. PC § 302 (disturbing a religious meeting);

    C. PC § 182 (conspiracy);

    D. PC § 647(c) (obstruction of a sidewalk);

    E. PC § 22810 (A) Illegal possession of Tear Gas

28. Defendants further characterized PLAINTIFF and other picketers as members of an alleged organized group referred to as the "Squirrel Squad," which Defendants described as an organized hate group, despite the absence of any factual basis supporting such designation. The unique terms "Squirrel" and "Squirrel Busters" were assigned personally by L Ron Hubbard, founder of the Church of Scientiology, These terms are found in internal instruction and policy documents and are specifically used to identify individuals who practice Scientology outside of the church or anyone perceived to be antagonistic toward the organisation.

29. At no time was PLAINTIFF convicted of conspiracy, disturbing a religious meeting, or obstruction of a sidewalk, nor was PLAINTIFF subject to any permanent civil harassment restraining order prohibiting his presence on public sidewalks.

AMENDENDED COMPLAINT ORIGINAL 9

30. At the same time, Defendants failed and refused to investigate, arrest, or prosecute numerous individuals who committed batteries, assaults, theft, and other criminal acts against PLAINTIFF and protesters identified as part of the "Squirrel Squad", despite the existence of police reports, eyewitness testimony and available surveillance evidence.

31. PLAINTIFF was repeatedly subjected to custodial detentions, arrests, swattings, searches, and threats of incarceration, incidents in which PLAINTIFF was held at gunpoint, handcuffed, and searched without probable cause numerous times..

32. Scientology has formal policies directing members and affiliated personnel to target and discredit perceived critics or "attackers," including the explicit directive: *"NEVER agree to an investigation of Scientology. ONLY agree to an investigation of the attackers."* (HCO Policy Letter, February 25, 1966)

33. Scientology policy directs members to initiate campaigns to discredit perceived adversaries, including the directive:
*"If there will be a long-term threat, you are to immediately evaluate and originate a black PR campaign to destroy the person's repute and to discredit them so thoroughly that they will be ostracized."* (PR Series 24, May 30, 1974)

34. PLAINTIFF alleges that the series of actions taken against him—including arrests, unlawful property seizures, targeted swatting detentions, selective enforcement of the law and coordinated communication with out-of-state prosecutors—were not

AMENDED COMPLAINT ORIGINAL 10

isolated incidents but part of a deliberate pattern of targeted harassment. These actions were undertaken in a manner consistent with Scientology's "Fair Game" and "Dead Agenting" policies and in coordination with Scientology-affiliated private actors. "Fair Game" and "Dead Agenting" are acknowledged written policies of Scientology for dealing with individuals perceived as detractors.

35. PLAINTIFF further alleges that Scientology security personnel maintained direct communication with LAPD personnel and served as points of contact regarding PLAINTIFF and other picketers, including during incidents of targeted swatting.

36. LAPD officers and supervisors demonstrated prior knowledge of PLAINTIFF's identity, activities, and protest conduct, and that law enforcement responses were coordinated based on PLAINTIFF's presence and expressive activity.

37. Defendants' actions were undertaken intentionally, maliciously, and with reckless disregard for PLAINTIFF's clearly established constitutional rights.

38. As a direct and proximate result of Defendants' actions, PLAINTIFF suffered significant harm, including deprivation of liberty, unlawful seizure and retention of property - specifically his van, emotional distress, reputational harm, economic damages, and the chilling of his rights protected by the First Amendment.

39. PLAINTIFF brings this action to vindicate his constitutional rights, seek compensation for the injuries he has suffered, and prevent further unlawful and

unconstitutional conduct by Defendants.

## III. PARTIES

**PLAINTIFF,**

40. SCOTT HOCHSTETTER, aka Defender of Ants aka DOA    (hereinafter "PLAINTIFF") is a citizen of Illinois.  PLAINTIFF was lawfully present in public forums and engaged in protected expressive activity in the State of California.

**DEFENDANTS,**

41. CITY OF LOS ANGELES, ("LA") a municipal entity responsible for LAPD policies, training, supervision, and discipline,

42. Patrick Aluotto, ("ALUOTTO") in his official capacity as a Detective in the LAPD Hollywood Division, and in his individual capacity;

43. Heather Mata, ("MATA") in her official capacity as a Senior Lead Officer in the LAPD, Hollywood Division, and in her individual capacity;

44. Douglass Hall, ("HALL") in his official capacity as a Detective in the LAPD Hollywood Division, and in his individual capacity;

45. Jesse Rubacalva, ("RUBACALVA") in his official capacity as a Senior Lead Officer in the LAPD Hollywood Division, and in his individual capacity;

46. Erica Emeterio, ("EMETERIO") in her official capacity as an Officer in the LAPD Hollywood Division, and in her individual capacity;

47. David Doyle, ("DOYLE") in his official capacity as an Officer in the LAPD Harbor Division and in his individual capacity;

48. Jerry Torres, ("TORRES") in his official capacity of Detective in the LAPD Central Division Major Crimes Unit and in his individual capacity;

49. Timothy Talman, ("TALMAN") in his official capacity as an Officer in the LAPD Hollywood Division and in his individual capacity;

50. Raymond Valois, ("VALOIS") in his official capacity as Captain of the LAPD Communications Division and in his individual capacity;

51. Craig Heredia, ("HEREDIA") in his official capacity as Captain, of the LAPD Hollywood Division and in his individual capacity;

52. Annabelle Eubank, ("EUBANK") in her official capacity as Senior Lead Officer in the LAPD Hollywood Division and in her individual capacity;

53. Christopher Velasco, ("VELASCO") in his official capacity as an Officer in the LAPD Hollywood Division and in his individual capacity;

54. James Richardson, ("RICHARDSON") in his official capacity as an LAPD Clergy Council, and his official capacity of Hollywood CPAB Member #00898, and in his individual capacity;

55. AARON NICOLARSON, ("NICOLARSON") in his individual and official capacity as a Security Guard for Celebrity Centre International;

56. Church of Scientology Celebrity Centre International, a legal person

57. DOES 1-40.

## IV. FACTUAL ALLEGATIONS

### FEBRUARY 16, 2024

58. On or about February 16, 2024 LAPD coordinated the arrest of four picketers in a show of force, coordinated at three different times to effect fear in picketing at La Poubelle and also at Scientology properties.

59. On or about February 16, 2024 numerous LAPD officers, including ALUOTTO and other unidentified LAPD Does effected a felony arrest of Jasiah Adler ("ADLER") in front of the BAR. Officers told picketers that he was being arrested for something not related to the protests. This was not true.

AMENDENDED COMPLAINT ORIGINAL 14

60. Later, ALUOTTO told ADLER that "this is what happens when you protest Scientology". The felony arrest came from allegations from Patrick Perry ("PERRY") who had attacked protesters on three different occasions.

61. PERRY has an extensive criminal background and claimed that ADLER made criminal threats in violation of PC § 422. ADLER spent seven days in custody, but the charges were ultimately dismissed. ADLER never made any criminal threats.

62. On or about February 16, 2024 two BAR patrons, Jane Doe 1 and Jane Doe 2, exited the tent on the public sidewalk, verbally assaulted the picketers by saying, "You all are fucking weirdos" and committed a PC § 242 battery by hitting picketer Daniel Villeda Gonzalez, ("GONZALEZ")'s phone .

63. Jane Doe 1 and Jane Doe 2 then attempted to flee the scene. GONZALEZ attempted to obtain some identifying features to positively identify them for a police report. The two individuals committed a second PC § 242 battery by striking GONZALEZ's phone causing it to fall to the ground and again attempted to leave the scene.

64. During the second battery, GONZALEZ discharged pepper spray in self defense at the attackers. Appearing intoxicated, Jane Doe 1 and Jane Doe 2, proceeded to their vehicle. As they fled, the driver, Jane Doe 2, struck a parked vehicle.

AMENDENDED COMPLAINT ORIGINAL 15

65.　Jane Doe 1 and Jane Doe 2 then drove to the Hollywood Police Department "HPD" and filed a police report and a PPA. Before the report was completed, Officers MATA and RUBALCAVA were notified and responded to the HPD to obtain the PPA's for the alleged PC § 242 battery.

66.　MATA, RUBALCAVA, ALUOTTO, DOYLE, EMETERIO, SALAZAR and other LAPD officers executed a coordinated tactical plan to effect the arrests of GONZALEZ and picketer Kamrin Ivone ("IVONE") based on PPA's filed by Jane Doe 1 and Jane Doe 2 arising from the incidents in which GONZALEZ's and IVONE's phones were struck.

67.　At the same time, in front of the BAR, another patron, John Doe 1, exited and approached two female picketers asking questions whilst committing a PC § 242 battery, by blowing what appeared to be, marijuana smoke directly in and about their faces.

68.　This also violates California Health and Safety Code 11362.1 and Government Code section 7597 (1). Smoking marijuana on public sidewalks and smoking within 20ft of a public entrance.

69.　IVONE stepped next to the female picketers and told John Doe 1 that he had already told him the purpose of the demonstration. John Doe 1 then stepped forward and committed a PC § 242 battery, by hitting IVONE's phone, causing it to fall to the ground and break the screen, resulting in 100 dollars in damages.

AMENDENDED COMPLAINT ORIGINAL 16

70. John Doe 1 then grabbed IVONE's chest with both hands and pushed him into the side of a vehicle behind IVONE.

71. At the same time the PLAINTIFF noticed the aggressive nature of John Doe 1 blowing smoke at the two females and attacking IVONE, the PLAINTIFF then made an effort to restrain John Doe

72. As PLAINTIFF attempted to restrain John Doe 1 from behind, they were both shoved by an unknown person away from IVONE into the tent in front of the BAR.

73. PLAINTIFF tripped on the tent on the public sidewalk falling backwards with John Doe 1, with PLAINTIFF absorbing the fall. As they fell GONZALEZ pepper sprayed John Doe 1 and PLAINTIFF in the face.

74. John Doe 1 stood up and started verbally berating PLAINTIFF as PLAINTIFF took numerous steps back to deescalate the situation with John Doe 1 stepping forward.

75. The BAR's security guard, Dervonne Christopher ("CHRISTOPHER") grabbed John Doe 1 and attempted to calm him down.

AMENDENDED COMPLAINT ORIGINAL 17

76. John Doe 1 then threw what appeared to be a marijuana joint at IVONE, committing a battery under PC § 242 and aggressively stepped in front of and in the face of another picketer, Lara Anderson ("ANDERSON"). John Doe 1 subsequently took his shirt off and threw it at PLAINTIFF. John Doe 1 then aggressively challenged PLAINTIFF to step around the corner to "finish this."

77. At 22:07 according to the CAD call incident report tendered over to PLAINTIFF, a call to service came in for a PC §242 battery at the BAR and the incident recall report had special instructions from VALOIS.

78. VALOIS, Captain of Communications for LAPD, had implemented special instructions requiring supervisors to show up or to contact RICHARDSON, Head of Security of a private religious organization at SCC and a member of the LAPD Clergy, whenever calls for service occurred within a predefined zone.

79. The Penal Code § 242 batteries did not occur on any property owned by Scientology. According to CAD records from the prior three months, the majority of calls for service originated from Scientology security guards. PLAINTIFF alleges that routing calls for service to a private Scientology organization is improper.

80. According to CAD call records obtained through California Public Records Act requests, there were approximately 213 calls for service between December 2023 and April 2024.

AMENDENDED COMPLAINT ORIGINAL 18

81. MATA, RUBALCAVA, ALUOTTO, DOYLE, EMETERIO, SALAZAR, and other LAPD officers then arrived at the scene and effectuated the two PPA arrests on GONZALEZ and IVONE. Upon witnessing the victims of the batteries being arrested, PLAINTIFF became fearful, left the area and returned to his vehicle approximately one block away.

82. MATA, RUBALCAVA, ALUOTTO, DOYLE, EMETERIO, SALAZAR and other LAPD officers refused to review any video footage of more than twenty picketers and instead spoke only to John Doe 1, who committed multiple batteries, and CHRISTOPHER.

83. No officer on the scene took a report from any picketer. No officer obtained video footage from the BAR or neighboring businesses. Furthermore no officer subsequently contacted any of the picketers or the observers to take a report or to review their video evidence of the incident.

84. At 22.22 EMETERIO took a battery report for John Doe 1. CHRISTOPHER, the security guard for the BAR told MATA that PLAINTIFF possessed a weapon. MATA then broadcast over the radio that the battery suspect was possibly armed.

85. MATA informed other officers that they were effectuating a PPA on PLAINTIFF for battery. PLAINTIFF having turned the corner, with no officers in sight, proceeded to his vehicle. Upon realising his keys were locked inside his vehicle

AMENDENDED COMPLAINT ORIGINAL 19

PLAINTIFF decided to return to the BAR at which point officers intercepted and arrested him for battery.

86. PLAINTIFF was held at gunpoint by two officers. One unidentified officer aimed a hand gun and another aimed a shotgun at him, despite PLAINTIFF immediately complying when instructed to stop.

87. John Doe 1 was then transported in a LAPD vehicle to the location where PLAINTIFF was being held for a field show up. At that time John Doe 1 identified PLAINTIFF as the individual who allegedly committed the battery, directly contradicting his earlier statement to EMETERIO in a police report, in which he stated that he "did not see who grabbed him from behind."

88. At 22:22 EMETERIO completed a police report on scene and, within minutes, effectuated an arrest without verifying any information and without reviewing any video evidence to establish probable cause, relying solely on John Doe 1's testimony. No PPA was filed on scene. PLAINTIFF was arrested by LAPD officers based only on John Doe 1's statements and no officer witnessed PLAINTIFF committing the alleged crime.

89. Minutes after the positive identification ALUOTTO whilst speaking with MATA stated that John Doe 1 did not witness who grabbed him from behind and that the security guard intended to complete a PPA. CHRISTOPHER never filed a PPA. No officer witnessed the alleged battery.

AMENDENDED COMPLAINT ORIGINAL 20

90. ALUOTTO did not attempt to rectify the fieldshow up identification. ALUOTTO later claimed that he was unable to locate the security guard after the arrest, despite video evidence showing CHRISTOPHER present and stationed in front of the BAR. ALUOTTO had also spoken to CHRISTOPHER before the arrest, obtained his phone number and stated he would call if any further information was needed. .

91. When ALUOTTO was asked if he wanted to declare the remaining people picketing at the BAR as an unlawful assembly, ALUOTTO replied 'no'.

92. ALUOTTO can be seen on body cam footage shortly afterwards attempting to get other officers to turn off their body cams by pointing to his own camera. Another officer on the scene shook his head and refused, preventing ALUOTTO from turning off his body cam, preserving potential evidence.

93. PLAINTIFF's vehicle was then towed for fingerprints. No fingerprints were ever taken from the vehicle. The vehicle was legally parked on a public street. No other arrests for simple battery before or after this incident resulted in the towing or impounding of vehicles.

94. PLAINTIFF's vehicle was searched the next day for weapons based on ALUOTTO's affidavit for a Search Warrant for PLAINTIFF's vehicle. ALUOTTO made numerous claims in the affidavit.

95. In the affidavit ALUOTTO claims that the protesters (picketers) were blocking sidewalks and harassing customers. However, no picketer was ever arrested for PC § 647(C) obstruction of a sidewalk and not one picketer was issued a permanent restraining order for civil harassment.

96. ALUOTTO stated in an affidavit that protesters were filming people coming and going from the restaurant and stated that their goal was to shut it down. Picketers did film, exercising their First Amendment rights, filming also for safety and to capture evidence to validate misrepresentation of their activities by the LAPD and/or patrons of the BAR.

97. It is both common and lawful in Hollywood, and a widely accepted practice for paparazzi to film public figures as they enter and exit restaurants and other establishments. The BAR was a known hot spot for celebrities, including but not limited to Danny Masterson, Ashton Kutcher, Mila Kunis and Ghislane Maxwell's Lawyer Leah Saffian.

98. ALUOTTO's affidavit for search warrant never offered any evidence of PLAINTIFF conspiring with others. PLAINTIFF never shared an email, a text message, or a phone call with any of the others mentioned in the affidavit and had very limited contact with them at that point. PLAINTIFF also stated numerous times on Live-Streams that he did not like pepper spray and has never used pepper spray in his life.

AMENDENDED COMPLAINT ORIGINAL 22

99. PLAINTIFF was initially arrested for battery and, the following morning he was rearrested for felony conspiracy and illegal use of pepper spray. Officers claimed the incident involved an unlawful assembly and that PLAINTIFF, as a purported felon, was prohibited from possessing pepper spray. PLAINTIFF maintains he never used tear gas, is not a felon, and no verbal dispersal order was issued. ALUOTTO also stated on body worn camera footage that the assembly was not unlawful.

100. PLAINTIFF was deprived of his liberty and was held in custody from February 16, 2024 to February 22, 2024.

101. On numerous occasions and without success PLAINTIFF attempted to speak with investigators at the HPD. PLAINTIFF was informed that HALL was the assigned investigator, yet HALL refused to meet or speak to PLAINTIFF during any of his numerous visits to the HPD. HALL did, however, coordinate with Scientology, exchanging numerous emails with various members of the organization.

102. On or about March 10, 2024 PLAINTIFF followed up at the HPD on prior battery investigations in which he was the victim. Officer Olivera informed PLAINTIFF that Rodriguez had been assigned to the case. Despite this, no officer met with PLAINTIFF nor did any officers contact him to provide updates or conduct follow up. As a result, PLAINTIFF received no information regarding the status of the investigations and was left without communication concerning the crimes

AMENDENDED COMPLAINT ORIGINAL 23

committed against him.

103. On or about March 14, 2024 MATA and EUBANK took a hate crime report regarding the PLAINTIFF concerning an incident that occurred on March 8, 2024. The report was taken via an unrecorded telephone call, without body-worn camera footage and without any corresponding call to service through 911.

104. At Scientology Celebrity Centre ("SCC") a security guard alleged that PLAINTIFF's van displayed the message 'Scientology is a Cult' characterizing the statement as hate speech and further claimed that PLAINTIFF utilized an amplified device for 10 minutes. The security guard subsequently used large amplified speakers to play music. Based on these allegations, MATA completed and filled out a hate crime report. PLAINTIFF was never arrested or charged under PC § 302 for disturbing a religious meeting.

105. On or about March 14, 2024 MATA and EUBANK took a further hate crime report regarding the PLAINTIFF concerning an incident that occurred on March 9, 2024. This report was taken through private communications that were not recorded.

106. The SCC Security guard alleged that PLAINTIFF used an amplified device for approximately 10 minutes stating that 'Scientology supports Human trafficking and rape' and that the message displayed on his van 'Scientology is a cult' constituted hate speech. The security guard further claimed that he was engaged in worship during those 10 minutes and that the PLAINTIFF's statements

disturbed him.   PLAINTIFF was never arrested or charged under PC § 302 for disturbing a religious meeting.

**MARCH 14, 2024**

107. On or about March 14, 2024 a further report was filed for an alleged violation of PC § 302 on March 12, 2024 by MATA and EUBANK, after receiving private communications from an unknown member of the SCC. This was not done through the normal avenues for reporting a crime and no call to service was made via 911.

108. MATA and EUBANK claimed in all three police reports that the 'Squirrel Squad' had made numerous false reports of emergencies, violent crimes and property crimes.   However, no picketer had been arrested for any property crime or charged with making false reports.   MATA further alleged that PLAINTIFF was using an amplified device, while noting that SCC security members subsequently used amplified devices to play music.

109. MATA and EUBANK treated this complaint as a hate crime and completed the necessary paperwork.   PLAINTIFF was never charged with a violation of PC § 302.   MATA asserted that PLAINTIFF's statement 'Scientology is a cult' constituted a hate crime despite being protected expression under the First Amendment.

AMENDENDED COMPLAINT ORIGINAL 25

**MAY 25, 2024 - PPA ARREST**

110. On or about May 25, 2024, PLAINTIFF was arrested on a PPA for an alleged violation of PC § 302 (disturbing a religious meeting) by SCC security guard NICOLARSON and taken into custody by VELASCO. On that date, two calls for service were made for the BAR at 5907 Franklin Ave, the first at 18:44 hours for a PC § 415 disturbance, to which unit 6FB34 was dispatched and the second at 23:01 hours for a PC § 245 assault, to which unit 6A15 was dispatched..

111. PLAINTIFF was in his parked vehicle in front of the BAR when both the BAR and SCC were playing loud amplified music outside their establishments. To be heard over the music PLAINTIFF used a bullhorn to make statements explaining the reasons for his picketing of the La Poubelle ("BAR"). The statements contained no obscenities and were directed at Francious Koster ("KOSTER") and the BAR. This activity lasted for approximately 5 to 10 minutes. During this time KOSTER was in her car without license plates in violation of California Vehicle Code § 5200.

112. According to the police report filed by VELASCO and officer Rizea, unit 6FB34 received a call for service at 20:10 hours for a reported PC § 245 (assault with a deadly weapon) at 5907 Franklin Ave. However, according to CAD records Unit 6FB34 was dispatched at 18:44 hours for a PC § 415 disturbance. Additionally, Unit 6A15 was dispatched at 23:01 hours for a separate PC § 245 (assault with a deadly weapon).

113. Instead of responding directly to the location listed in the call for service at 5907 Franklin, officers made their way to SCC. Within ten minutes of the call for service being made, the officers arrived at a location not specified in the call, where they found a Scientology security guard. The officers took a police report, had NICOLARSON complete a PPA and then interviewed two additional witnesses, taking their statements. RICHARDSON was present during these statements.

114. PLAINTIFF was arrested and officers committed a battery on two different protesters whilst arresting PLAINTIFF. HALL was the investigator assigned to the case. PLAINTIFF was jailed for a few hours. When PLAINTIFF attended court, he was not listed on the docket. PLAINTIFF was arrested and was in jail for a few hours.

**JUNE 21, 2024 - NOT ON DOCKET**

115. On June 21, 2024, PLAINTIFF attended court for the PPA arrest on May 25, 2024. However, PLAINTIFF was not listed on the docket. PLAINTIFF received a Proof of Appearance from the clerk at the clerk's office.

**DECEMBER 31, 2024**

AMENDENDED COMPLAINT ORIGINAL 27

116. On or about December 31, 2024, in Case No. 24STRO01357 The Honorable Richard Bloom issued a proposed judgement awarding PLAINTIFF's lawyers $120,487.94 in fees for a successful anti-slapp motion in the LA County Court. This ruling followed a restraining order that was issued by KOSTER, the owner of the BAR. PLAINTIFF was engaged in constitutionally protected speech on the public sidewalk in front of the BAR, despite KOSTER's claims that the PLAINTIFF was stalking him. Contrary to claims by ALUOTTO that picketers were involved in harassment.

## V.  SELECTIVE ENFORCEMENT OF PPAS

117. Beginning in December 2023 and continuing through the end of 2024, PLAINTIFF alleges selective enforcement of laws and violations of the Equal Protection Clause of the Fourteenth Amendment. Individuals who aligned with protests against Scientology were targeted and arrested for their activities, while others who engaged in the same or similar conduct were not arrested and were often labeled as victims.

118. On or about December 4, 2023, a Scientology security guard filed a private person arrest ("PPA") for a California Penal Code ("PC") § 242 battery after a woman picketing Scientology accidentally brushed the security guard on the public sidewalk. EMETERIO and SALAZAR were present.

AMENDENDED COMPLAINT ORIGINAL 28

119. On or about  December 4, 2023, Scientologist Alberto Godinez smacked Scientology picketer GUDE's phone and hand.  Officer Brian White refused to take a report and refused to file a PPA.

120. On or about December 23, 2023,  PERRY's dog bites picketer Christian Shin ("SHIN") and a bystander behind the Scientology Testing Center ("STC") in Hollywood. Scientology security guards were present.  No arrests were made.

121. On or about January 2, 2024, a Scientology picketer by the name of SP Spanglish is threatened with a baton by PERRY and his aggressive dog.  An unidentified LAPD officer refused to take a report or file a PPA.   Scientology Security staff were present.

122. On or about January 5, 2024, GUDE was spat on by suspect Brian Borland in front of the STC.  Mr. Borland was arrested for a PC § 242 battery.  Mr Borland was never prosecuted for this crime.

123. On or about January 14, 2024, Scientology picketer ADLER, was detained by unknown Hollywood police officers at STC for alleged possession of a gun. This was a false call to service, also known as a swatting call.  ADLER had no weapons and was not given a Marsy's Law Pamphlet.

124. On or about January 15, 2024, SHIN was a victim of a swatting call after a false bomb threat allegedly was made at the Scientology Blue Building Campus

AMENDENDED COMPLAINT ORIGINAL 29

("BLUE") in Hollywood.  No bomb squad was deployed and the building was not evacuated.  SHIN was detained for about half an hour and was not given a Marsy's Law Pamphlet.

125. On or about January 17, 2024, ADLER was a victim of another swatting claiming he allegedly had a firearm at the STC.  He was detained, searched, cuffed and then released. He was not given a Marsy's Law Pamphlet.

126. On or about January 19, 2024, Scientology picketer Aaron Smith-Levin ("ASL") was arrested a block away from the STC after PERRY allegedly struck ASL in the head with a cane and released his dog on him.

127. ASL was arrested for PC § 646.9 felony stalking after TALMAN stated that if ASL files a report on PERRY, he will be arrested for felony stalking. ASL filed a report, was arrested and handcuffed to the Hollywood Police department (HPD) bench for a few hours and then released with no charges.  ASL was not given a Marsy's Law Pamphlet. PERRY was not prosecuted.

128. On or about January 23, 2024 ADLER and Scientology picketer Solomon Sassoon ("SASSOON") were detained at BLUE for a swatting call for allegedly possessing a firearm.  Both were handcuffed and searched. No gun was found.

129. They remained cuffed after finding no gun on their persons until PLAINTIFF advocated for their release, questioning why they were still cuffed after finding no

gun and that it was a false call to service. Neither victim was given a Marsy's Law Pamphlet.

130. On or about February 2, 2024, Scientology picketer Mindy Willens ("WILLENS") was the victim of a PC § 242 battery when JoLane Rae Lentz ("LENTZ") lunged and hit Willens' phone. JoLane is the wife of Greg Morris ("MORRIS"), the owner of the Gourmet Market next to the BAR.

131. On or about February 9, 2024, whilst on the public sidewalk, Scientology picketer PALMADESSA was struck in the chest by an employee of the BAR when he reached his hand through the al fresco dining tent and committed a PC § 242 battery. The LAPD were called numerous times and arrived two and a half hours later, despite the numerous 911 calls by PALMADESSA.

132. When officers arrived, DOYLE then refused to take a PPA, blaming PALMADESSA for standing too close to the tent even though she was located on a public sidewalk. DOYLE did not seek out video surveillance from the BAR or the SCC across the street. PALMADESSA was not given a Marsy's Law Pamphlet.

133. On or about February 13, 2024, whilst two BAR security guards watched, a patron from the BAR committed a PC § 242 battery by smacking at GONZALEZ because he was filming on the public sidewalk. Officer Brian White was present at this battery and did not take the suspect into custody.

AMENDENDED COMPLAINT ORIGINAL 31

134. Minutes later another BAR patron committed a PC § 242 battery by smacking the phone of a picketer who had a Youtube channel called "Help Me Film Them." Hollywood police officers were present and did not arrest the attacker. GONZALEZ was not given a Marsy's Law pamphlet nor was the other picketer.

135. LAPD Hollywood Officers and two BAR security officers then provided security for the BAR for about 35 minutes after not arresting either of the BAR patrons.

136. On or about February 14, 2024, a patron at the BAR named Daniel exited the tent in front of the BAR on the public sidewalk and instigated an argument with GONZALEZ, saying he could not film him. Daniel then lunged at GONZALEZ and struck his phone and hand.

137. GONZALEZ then discharged pepper spray in self defense and sprayed Daniel in the face. Daniel retreated into the BAR. LAPD officers arrived and took PC § 242 battery reports for both Daniel and GONZALEZ. No arrests were made.

138. LAPD officers did not obtain security footage from the BAR, neighboring establishments or the SCC cameras across the street. GONZALEZ was not provided with a Marsy's Law Pamphlet.

139. On or about February 22, 2024, Natalie Shine committed a PC § 242 battery on PLAINTIFF by swinging her purse and striking him in the face when exiting the BAR. A police report was filed incident #240222005605. There was no arrest, no

AMENDENDED COMPLAINT ORIGINAL 32

investigation, and no follow up. Natalie Shine's husband was connected to Danny Masterson's Vineyard.

140. On or about February 22, 2024, a drunk female Patron of the BAR, threw a cigarette at ANDERSON. LAPD officers arrested the woman. No charges were filed, no inquiry or follow up investigation was carried out.. No Marcy's Law Pamphlet was given to ANDERSON.

141. On February 23, 2024 while standing in front of the BAR, an unidentified individual ran from approximately 20 feet away and forcibly snatched a new cell phone, valued at $1,300, directly from the PLAINTIFF's hands and fled the area.

142. PLAINTIFF gave chase and a block away, the suspect placed the phone on top of a car before fleeing several blocks, after which the suspect was arrested. PLAINTIFF filed a report, Incident number 240606519. LAPD arrested the suspect. No Marcy's pamphlet was handed out, no investigation, no prosecution, and no follow up communication was made.

143. On or about February 24, 2024, a patron of the BAR, Hans Uder, committed a PC § 242 battery on a Scientology picketer named Sergio when exiting the tent at the BAR. PLAINTIFF tried to obtain identifying information from Mr Uder who then committed a PC § 242 battery and smacked the phone from PLAINTIFF's hand.

AMENDENDED COMPLAINT ORIGINAL 33

144. Mr Uder then continued by pointing out the location of where one of the Jane Does alleged that she was raped after being drugged in the BAR that he just left. No investigation was conducted, no follow up calls were made and no arrests were carried out despite knowing the name and location of Mr. Uder. No Marcy's Law Pamphlet was offered to PLAINTIFF.

145. On or about March 9, 2024, a patron leaving the BAR committed a PC § 242 battery on PLAINTIFF by pushing him into oncoming traffic. Officer Oliva takes a police report with incident number 24052500384. No follow up investigation was conducted, no arrest was made, and PLAINTIFF was not provided with a Marcy's Law Pamphlet.

146. On or about March 9, 2024, a patron exited the BAR when Scientology Picketer Sergio was assaulted again. ALUOTTO and other officers on the scene refused to take a police report or file a PPA. In order to file the report, ALUOTTO attempted to lure Sergio onto private property by patting his leg as if he was coaxing a dog to come.

147. At the same time ALUOTTO told another Picketer that they were trespassing on the property making it clear that Sergio could be arrested for trespass if he stepped on the property to make a police report.

148. The suspect fled to 'Byrds', a bar and restaurant a few businesses down. The officers walked over to the location, entered the premises but did not arrest the

AMENDED COMPLAINT ORIGINAL 34

suspect.  ALUOTTO then questioned Sergio's military service.  No report was taken, no follow up was conducted, no security camera footage was obtained and no Marcy's Law Pamphlet was offered.

149. Some time later PLAINTIFF encountered MATA and MORRIS speaking at the local pizza restaurant. The owner MORRIS, whose wife had attacked Mindy Willens, was asked if PLAINTIFF had been trespassed from his property. MORRIS  responded that no one had been trespassed from his property, directly contradicting prior statements by ALUOTTO that Picketers were trespassing on the premises.

150. On or about March 9, 2024,  patrons of the BAR, Dillon Leigh and Jesse Sabol, exited the establishment and committed multiple acts of battery against GUDE. A cigarette was tossed at GUDE, constituting a violation of PC § 242 battery.  GUDE was then pushed, another PC § 242 battery.  Subsequently GUDE was punched in the face resulting in a broken nose and significant bodily injury constituting a violation of PC § 245 assault with a deadly weapon and/or force likely to produce great bodily injury.

151. ALUOTTO refused to take a PPA or police report and subsequently committed a PC § 242 battery on GUDE by pushing him, claiming he was blocking the sidewalk even though the sidewalk was not blocked.

AMENDENDED COMPLAINT ORIGINAL 35

152: The suspects fled into the BAR and concealed themselves. The BAR has no rear exit. ALUOTTO and other officers entered the BAR and then exited claiming that the suspects had left. A Scientology Picketer films the front door of the BAR after ALUOTTO leaves and captures the suspects leaving the bar and getting into an uber.

153. On or about April 4, 2024, HALL conducted a follow up investigation into PLAINTIFF for three alleged violations of PC § 302 (disturbing a religious meeting) occurring on March 8, March 9, and March 12 at the SCC. He did not conduct a follow up investigation for any of the previously mentioned PC § 242 batteries and PC § 245 assaults with deadly weapons committed against picketers. In this follow up report HALL characterized the PLAINTIFF as engaging in an aggressive form of civil harassment, despite the fact that PLAINTIFF had no permanent restraining orders for civil harassment in 2024, 2025 or 2026.

154. On or about April 17, 2024, BAR patron Cage Crismond attacked PLAINTIFF while he was seated outside the BAR. Crismond flipped over PLAINTIFF's table, scattering flyers and when PLAINTIFF stood Crismond punched him in the face, constituting a violation of PC § 245 (assault with a deadly weapon or force likely to produce great bodily injury).

155. The impact caused PLAINTIFF to fly back into his table, breaking it and resulting in a black eye for PLAINTIFF. LAPD officers Borjas and Olive filed a police report with incident number 24041700005242. No investigation was conducted,

AMENDENDED COMPLAINT ORIGINAL 36

no follow up occurred and PLAINTIFF was not provided with a Marcy's Law Pamphlet.

## VI. DEFENDANTS CONSPIRING TOGETHER

156. On or about April 27, 2014, TALMAN is pictured with US congressman Adam Schiff inside Scientology building in full LAPD uniform to participate in the Finish the Ride fundraiser.

157. On or about December 1, 2018, TALMAN are pictured in full LAPD uniform in the Scientology Celebrity Center at 26th Christmas Stories Gala.

158. On or about December 2022, TALMAN plays at the Scientology Christmas Gala at Scientology Celebrity Center ("hereinafter SCC"), in full LAPD uniforms.

159. On or about February 10, 2023, Francoise Koster, ("KOSTER") owner of La Poubelle Bistro and Bar ("BAR") sent an email to defendant MATA to set up a meeting. MATA and KOSTER meet at the Hollywood police department some time later.

160. On or about March 14, 2023, MATA invited KOSTER to the Hollywood Nightlife Community Police Advisory Board Meeting.

AMENDENDED COMPLAINT ORIGINAL 37

161. On or about October 21, 2023, TALMAN, EUBANK, MATA, and RICHARDSON all attended the Faith and Blue event in Hollywood. TALMAN, MATA and EUBANK were all in full LAPD uniforms.

162. On or about November 15, 2023, a Los Angeles Times criminal courts reporter, James Queally, emailed senior LAPD command staff seeking comment on alleged retaliation by Scientology against prosecutors, police officers, and victims connected to the Danny Masterson prosecution as well as collusion between Scientology and Hollywood Police Department.

163. On or about December 29, 2023 Scientology Jennifer Krauskopf contacted HALL for a private meeting about Scientology Picketers.

164. On or about February 14, 2024, unknown Hollywood LAPD officers provided private security and escorted KOSTER out of the BAR and stopped traffic with their vehicles to allow her to drive off.

165. KOSTER's car displayed no license plates, and the officers did not affect a citation or tow her car for illegally being on the road without license plates.

166. On March 20, 2024, three LAPD officers; LAPD Doe 1, who was on scene for the aforementioned arrest of Aaron Smith-Levin, LAPD Doe 2 and LAPD Doe 3 responded to La Poubelle Bistro & Bar following an unknown call to service. The officers told ADLER that he was not permitted to be at that location across the

AMENDENDED COMPLAINT ORIGINAL 38

street from the SCC.  ADLER had no stay away order from SCC.  The three officers then forced ADLER to cease picketing and threatened him with arrest if he did not leave.  No records exist of a call to service corresponding to this incident. ADLER left.

167. SCC coordinated with security personnel and law enforcement to employ policies such as Fair Game and Dead Agenting to silence its critics. Numerous pastors, ministers, and agents of the SCC actively worked to fabricate false police reports, attributing these reports to the picketers in an effort to discredit them.

168. SCC's policies encouraged its agents to target and attack anyone who is against the SCC and to conspire with LAPD and LA through a variety of means, including private meetings, private phone calls, volunteer events, community clean ups, and a range of other gatherings.  Officers attended multiple events organized by SCC, such as Christmas galas and other functions, to further their coordinated efforts.

169. On or about April 2, 2024 Captain HEREDIA conspired with private actors by sending an email to (Franciose) KOSTER and MORRIS as well as HALL (the primary investigator for the February 16, 2024 PC § 242 battery), RUBALCAVA, and two unidentified individuals, stating the following:

*"Francoise, Good evening. We will have officers in the area conducting directed patrol. They will be in the area and available to respond to calls for service, as appropriate.  The information regarding Scott Hochstetter (PLAINTIFF) planning*

*to be at/near your restaurant tonight has been shared with the supervisor and officers"*

**EMAILS TO WEST VIRGINIA**

170. On or about June 4, 2024 TORRES emailed Garrett Robertson at the West Virginia Prosecutors office at 12:07 PM notifying him of three police reports that were taken against PLAINTIFF for the Church of Scientology. In the email TORRES stated he was seeking a PC § 302 filing for the disruption of religious services.

171. The information about PLAINTIFF's probation conditions from protesting in West Virginia was obtained through the search of his vehicle on February 16, 2024. ALUOTTO did not specify in his affidavit that he was attempting to find papers. Although the affidavit for the warrant by ALUOTTO did not mention any specific papers sought, the PLAINTIFF'S probation papers were seized during the search which led officers to become aware of his probation conditions in West Virginia. Despite hundreds of papers that were under PLAINTIFF'S bed, only probation papers were seized. These probation papers explicitly stated that the PLAINTIFF could not be arrested.

172. On June 4, 2024, at 12:52 PM, Garrett Robertson forwarded the email to Dominic Orsini, a legal assistant at the West Virginia Prosecutor's Office, with a comment stating, *"check it out, fairly amusing."*

AMENDENDED COMPLAINT ORIGINAL 40

173. At 1:22 PM on June 4, 2024, Dominic Orsini forwarded the email to Prosecutor Catie Wilkes Delligatti, with the subject line: *"FW: Scott Hochstetter LAPD Reports."*

174. At 1:30 PM Prosecutor Catie Wilkes Delligatti then sent an email to her husband, an Attorney, Anthony Delligatti, with an attachment: *"image001.png and Church of Scientology Reports.pdf"* stating that *"The Scientologists called and offered to pay our cost of extradition if we revoke his probation."*

175. The specific DA rejection pursuant to PC § 849.5 states that in any case in which a person is arrested and subsequently released, and no accusatory pleading is filed charging the individual with an offense, the record of the person's arrest shall include a record of release. As a result the arrest shall not be considered an arrest, but rather a detention.

176. Officer TORRES, repeatedly referred to PLAINTIFF's detention as an arrest. Subsequently PLAINTIFF was then subjected to a bail revocation hearing. PLAINTIFF's lawyer argued that the incident was a detention, not an arrest, and as a result PLAINTIFF's probation was not revoked.

177. The West Virginia Prosecutors office subsequently revoked PLAINTIFF's probation. PLAINTIFF attended a revocation hearing with his lawyer who argued that PLAINTIFF was not arrested on February 16, 2024 but was instead detained,

in accordance with the specific provisions outlined in the DA rejection under PC § 849.5.

## VII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

178. First Amendment Retaliation (42 U.S.C. § 1983)

Against Defendants: CITY OF LOS ANGELES; MATA; EMETERIO; DOYLE; HALL; ALUOTTO; VELASCO; TORRES; HEREDIA; TALMAN; EUBANK; and DOES 1–40

179. PLAINTIFF realleges and incorporates all preceding paragraphs.

180. PLAINTIFF engaged in protected First Amendment activity, including peaceful protest, filming, journalism, and expressive speech on public sidewalks.

181. Defendants were aware of PLAINTIFF's protected activity.

182. In retaliation, Defendants engaged in adverse actions, including:

a.    Arresting PLAINTIFF on February 16, 2024;

b.    Referring PLAINTIFF to West Virginia prosecutors;

c.    Filing retaliatory reports under Penal Code § 302;

d.    Seizing PLAINTIFF's property;

183. These actions were motivated by PLAINTIFF's protected speech.

184. These actions would chill a person of ordinary firmness from continuing to engage in protected speech.

185. PLAINTIFF suffered damages, loss of income, emotional distress, shame

**SECOND CAUSE OF ACTION**

186. Fourth Amendment — False Arrest and Unlawful Seizure of Person (42 U.S.C. § 1983) Against Defendants: CITY OF LA; MATA; ALUOTTO; RUBALCAVA; EMETERIO; VELASCO; DOYLE; HALL; EUBANK and DOES 1–40

187. PLAINTIFF realleges all preceding paragraphs.

188. Defendants arrested PLAINTIFF without probable cause.

189. The arrest was based on unreliable statements, failure to review video evidence, no witness testimony taken from picketers at location and fabricated or unsupported allegations,

190. Charges were later rejected pursuant to Penal Code § 849.5.

191. PLAINTIFF was deprived of liberty from February 16–22, 2024.

192. PLAINTIFF suffered damages, shame, emotional distress

193. PLAINTIFF suffered from Panic Attacks after this event

**THIRD CAUSE OF ACTION**

194. Fourth Amendment — Unlawful Search and Seizure of Property (42 U.S.C. § 1983)

Against Defendants ALUOTTO; HALL; CITY OF LOS ANGELES; MATA; EMETERIO; DOYLE; RUBALCAVA; VELASCO; TALMAN; EUBANK; and DOES 1–40

195. PLAINTIFF realleges all preceding paragraphs.

196. Defendants illegally seized PLAINTIFF's:

    a.     Van;

    b.     Black socks;

    c.     West Virginia Papers.

197. PLAINTIFF suffered damages.

**FOURTH CAUSE OF ACTION**

198. Fourteenth Amendment — Equal Protection (Selective Enforcement)(42 U.S.C. § 1983) Against Defendants CITY OF LOS ANGELES; MATA; EMETERIO; DOYLE; HALL; ALUOTTO; RUBALCAVA; VELASCO; TORRES; TALMAN; EUBANK; and DOES 1–40

199. PLAINTIFF realleges all preceding paragraphs.

200. Defendants selectively enforced laws against PLAINTIFF.

201. Defendants used Penal Code §§ 837, 302, 182, and 647(c) against PLAINTIFF.

202. Defendants refused to arrest or investigate individuals who committed batteries and assaults against PLAINTIFF.

203. This selective enforcement was motivated by PLAINTIFF's protected speech.

204. PLAINTIFF suffered damages.

**FIFTH CAUSE OF ACTION**

205. Malicious Prosecution (42 U.S.C. § 1983)

Against Defendants MATA; ALUOTTO; EMETERIO; EUBANK; HALL; TORRES; NICOLARSON; SCC; VALOIS; HEREDIA; DOYLE, RUBACALVA, VELASCO; DOES 1-40

AMENDENDED COMPLAINT ORIGINAL 44

206. PLAINTIFF realleges all preceding paragraphs.

207. Defendants caused criminal charges to be filed without probable cause.

208. Charges were rejected..

209. Defendants acted with malice and retaliatory motive.

210. PLAINTIFF suffered damages.

## SIXTH CAUSE OF ACTION

211. Civil Rights Conspiracy  (42 U.S.C. § 1983)

Against Defendants CITY OF LOS ANGELES; MATA; HALL; ALUOTTO; TORRES; HEREDIA; EMETERIO; VALOIS; RUBALCAVA; TALMAN; RICHARDSON; and DOES 1–40

212. PLAINTIFF realleges all preceding paragraphs.

213. Defendants agreed to deprive PLAINTIFF of constitutional rights.

214. Defendants coordinated arrests, reports, and law enforcement actions.

215. Defendants communicated with Scientology security and West Virginia prosecutors

216. Defendants used public resources and coordinated 911 calls with private actors. Merging State and church together as one unit.

217. PLAINTIFF suffered damages.

## SEVENTH CAUSE OF ACTION

Municipal Liability (Monell Liability) (42 U.S.C. § 1983) Against Defendant CITY OF LOS ANGELES

218. PLAINTIFF realleges all preceding paragraphs.

219. The City maintained policies, customs, and practices including:

AMENDENDED COMPLAINT ORIGINAL 45

       a.      Retaliatory enforcement against protesters;

       b.      Coordination with Scientology security;

       c.      Failure to investigate crimes against PLAINTIFF and other scientology picketers;

       d.      Improper seizures and arrests.

220. These policies caused constitutional violations.

221. PLAINTIFF suffered damages.

## VIII. PRAYER FOR RELIEF

222. WHEREFORE, PLAINTIFF SCOTT HOCHSTETTER respectfully requests that this Court enter judgment in his favor and against Defendants, and grant the following relief:

223. Because related criminal proceedings arising from overlapping facts remain pending, PLAINTIFF reserves the right to seek a stay of this civil action, or a partial stay of discovery, to protect PLAINTIFF's Fifth Amendment rights and to avoid prejudice from parallel proceedings.

224. Declaratory Relief

       a.      A declaration that Defendants' actions, policies, customs, and practices described herein violated PLAINTIFF's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution;

       b.      A declaration that Defendants' actions constituted unlawful retaliation against PLAINTIFF for engaging in protected First Amendment activity;

225. Compensatory Damages

    a.    Compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial, including but not limited to damages for:

        i.    Loss of liberty;

        ii.    Emotional distress;

        iii.    Mental anguish;

        iv.    Reputational harm;

        v.    Loss of property;

        vi.    Loss of use of property;

        vii.    Economic losses;

        viii.    Legal expenses incurred defending against malicious and retaliatory criminal proceedings;

226. Special and Economic Damages

    a.    Damages related to lost income, lost opportunities, and financial harm resulting from Defendants' unlawful conduct;

227. Punitive Damages

    a.    Plaintiff seeks $20,000,000 in Punitive damages

    b.    Punitive and exemplary damages against the individual Defendants in their individual capacities, in an amount sufficient to punish and deter them and others from engaging in similar misconduct, as permitted by law;

228. Injunctive Relief

    a.    Preliminary and permanent injunctive relief prohibiting Defendants from:

i.    Retaliating against PLAINTIFF for engaging in protected First Amendment activity;

ii.   Subjecting PLAINTIFF to unlawful detention, arrest, or investigation without probable cause;

iii.  Retaining PLAINTIFF's property without lawful justification;

229.  An order requiring Defendants to return all seized property belonging to PLAINTIFF;

230.  Costs and Fees

a.    Reasonable attorney's fees and litigation costs pursuant to 42 U.S.C. § 1988 and other applicable law;

b.    Costs of suit incurred herein;

231.  Further Relief

a.    Such other and further relief as the Court deems just and proper.

## IX. JURY DEMAND

232.  PLAINTIFF hereby demands a trial by jury on all issues so triable.

I declare under penalty of perjury that the foregoing is true and correct.

4-8-26

Scott Hochstetter, Pro Per          Date

AMENDENDED COMPLAINT ORIGINAL 48